# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**

**No. 19-1782V**

Filed: June 23, 2026

```
*   *   *   *   *   *   *   *   *   *   *   *   *
                                                *
NOELLE LYNN CZOPEK, parent and                  *
natural guardian of C.L.H. Jr., a minor,        *
                                                *
                                                *
              Petitioner,                       *
                                                *
v.                                              *
                                                *
SECRETARY OF HEALTH                             *
AND HUMAN SERVICES,                             *
                                                *
                                                *
              Respondent.                       *
*   *   *   *   *   *   *   *   *   *   *   *   *
```

*Jason Luckasevic, Esq.*, Goldberg, Persky & White, P.C., Pittsburgh, PA, for petitioner.
*Ryan Miller, Esq.*, U.S. Department of Justice, Washington, DC, for respondent.

## DECISION[1]

**Roth**, Special Master:

On November 20, 2019, Noelle Lynn Czopek ("Ms. Czopek" or "petitioner") filed a petition on behalf of her minor son, C.L.H. Jr.,[2] under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10 *et seq.*[3] ("Vaccine Act" or "the Program"). Petitioner alleges that the measles, mumps, rubella, and varicella ("MMRV") vaccine C.L.H. received on August 24, 2018 caused him to experience heart failure and subsequently require a heart transplant. *See* Petition ("Pet.") at 1-2, ECF No. 1.

An entitlement hearing was held on October 3, 2023. Following careful review and analysis of the evidence in this case and in accordance with the applicable legal standards, I find that

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned finds that the identified material fits within this definition, such material will be redacted from public access.

[2] The minor was referred to as C.L.H. Jr. and C.L.H. throughout the proceedings. C.L.H. will be used in this Decision for consistency.

[3] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755 (1986). Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

1

petitioner has not provided preponderant evidence that the MMRV vaccine played any role in C.L.H.'s heart failure or his need for a heart transplant. Accordingly, petitioner is not entitled to compensation.

## I.    Procedural History

Petitioner filed her petition, medical records, and an affidavit from her expert, Dr. Howard Weber, on November 20, 2019. Petition, ECF No. 1; Petitioner's Exhibits ("Pet. Ex.") 1-30, ECF No. 5. The matter was briefly in Pre-Assignment Review ("PAR") and was assigned to me on November 25, 2019. ECF Nos. 4, 8-9.

Respondent requested additional medical records in a status report filed on February 24, 2020, but advised that based on the records already filed he intended to defend this case. He further submitted that Dr. Weber's affidavit "fails to articulate a legally-sufficient theory of causation" and his "causal opinion appears to rest entirely on a temporal connection . . . which is legally insufficient to prove causation." ECF No. 12.

On April 23, 2020, petitioner filed additional medical records, a supplemental affidavit from Dr. Weber, and a statement of completion. Pet. Ex. 31-38, ECF Nos. 19, 21.

Respondent then filed his Rule 4(c) Report simultaneously with expert reports from Drs. Scott Yeager and Chris Liacouras on September 8, 2020. Respondent's Exhibits ("Resp. Ex.") A-D, ECF Nos. 26-28.

On November 19, 2020, petitioner filed a supplemental affidavit from Dr. Weber and an affidavit from Dr. Lizabeth Lanford, C.L.H.'s treating cardiologist. Pet. Ex. 39-40, ECF No. 32. Petitioner also filed an unsolicited status report summarizing the affidavits filed along with her disagreements with respondent's Rule 4(c) Report and arguing that she had satisfied her burden for compensation. ECF No. 31.

Respondent filed a supplemental expert report from Dr. Yeager along with additional medical literature on January 28, 2021. Resp. Ex. E, ECF No. 36. Petitioner filed a responsive report from Dr. Weber with additional literature and what purports to be a list of cases in which Dr. Weber was involved as an expert on April 2, 2021. Pet. Ex. 41-49, ECF No. 38.

Respondent filed a supplemental report from Dr. Yeager on June 30, 2021. Resp. Ex. F, ECF No. 40.

A Rule 5 conference was held on October 21, 2021. C.L.H.'s complicated medical history and the experts' opinions were discussed. The parties agreed that the matter would proceed on a dual track of additional expert reports and settlement discussions. Petitioner was to prepare a reasonable demand and submit it to respondent. ECF No. 42.

On December 13, 2021, petitioner filed a status report confirming that a settlement demand had been submitted and a supplemental expert report with literature from Dr. Weber was filed. Pet.

2

Ex. 50-53, ECF Nos. 43-44. Respondent filed a status report on January 27, 2022, advising against settlement. ECF No. 46.

A status conference was held on March 11, 2022. ECF No. 53. Respondent filed a supplemental report and additional literature from Dr. Yeager on March 17, 2022. Resp. Ex. G, ECF No. 54. Petitioner advised by status report on April 4, 2022, that she wanted to proceed with an entitlement hearing. ECF No. 55.

An entitlement hearing was held on October 3, 2023. Following the hearing, additional expert reports were ordered from Dr. Weber and Dr. Yeager. ECF No. 74. Dr. Weber's report was filed on October 18, 2023. Pet. Ex. 57, ECF No. 78. Dr. Yeager's report was filed on November 30, 2023. Resp. Ex. J, ECF No. 79. The parties advised that post-hearing briefs were not necessary. ECF No. 80.

This matter is now ripe for adjudication.

## II.    Relevant Terminology

The following terms appear throughout this Decision and in the medical records.

**Vasculitis** is broadly defined as inflammation of a blood vessel. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1996 (33rd ed. 2020) [hereinafter *Dorland's*]. The term refers to a group of diseases characterized by inflammation and fibrinoid necrosis of the vascular wall. It may be primary without identifiable cause or secondary due to infection, malignancy, or autoimmune disease. Pet. Ex. 49 at 1. Systemic vasculitis can affect the heart, inducing either an ischemic or inflammatory process. *Id*. at 6. Symptoms include headache, fever, fatigue, weight loss, general aches and pains, dizziness, ringing in the ears, abrupt hearing loss, red, itching or burning eyes, double vision, temporary or permanent vision loss, numbness or weakness in a hand or foot, swelling of the palms in hands or soles of the feet, shortness of breath, blood when coughing, and red spots, lumps or open sores of the skin. Pet. Ex. 46 at 1-2.

The cause of vasculitis is unknown but possible triggers for "this immune system reaction" include infection like Hepatitis B and C, blood cancers, immune system diseases like rheumatoid arthritis and lupus, and drug reaction. Pet. Ex. 46. at 2. Vasculitis is treated by controlling inflammation by way of corticosteroids, immunosuppressive drugs, anti-clotting medications, or immunoglobulin therapy ("IVIG"). Pet. Ex. 53 at 4.

The **heart** is the cardiac muscle that maintains the circulation of the blood. It is divided into four chambers—two atria and two ventricles. Typically, the left atrium receives oxygenated blood from the lungs. From there the blood passes to the left ventricle, which forces it via the aorta through the arteries to supply the tissues of the body. The right atrium receives the blood after it has passed through the tissues and given up much of its oxygen. The blood then passes to the right ventricle and then to the lungs to be oxygenated. *Dorland's* at 816. In a normally-functioning heart, the left side propels the blood in systemic circulation, while the right side propels the blood in pulmonary circulation. *Id*. at 358, 816.

**Hypoplastic left heart syndrome**, or HLHS, is a congenital heart condition in which the left side of the heart, including the aorta, aortic valve, left ventricle, and mitral valve, is underdeveloped. Pet. Ex. 45 at 1. By definition, all HLHS patients are part of the **single-ventricle** population because only one ventricle of the heart is functional. Resp. Ex. A Tab 1 at 1; Resp. Ex. C Tab 1 at 2; Resp. Ex. C Tab 3 at 1. When openings typically present at birth in newborns close, the blood in HLHS patients cannot easily get to the rest of the body and they experience difficulty breathing, pounding heart, weak pulse, and ashen or bluish skin color. Pet. Ex. 45 at 1. The cause of HLHS is unknown, although some may be genetic. *Id*. at 2. If not treated, HLHS is fatal within days to the first weeks of life. Treatment includes a series of three invasive surgeries for staged reconstruction of the left side of the heart with heart transplant necessary in some cases. *Id*. at 2-4; Pet. Ex. 44 at 1. The three-part surgeries are palliative—not reparative. *Id*.; *see generally* Resp. Ex. C Tab 1.

Stage I of the palliative surgery in HLHS is the Norwood procedure, generally performed within the first week of life. Resp. Ex. C Tab 1 at 5. The goal is to allow for unobstructed systemic circulation within the right ventricle and establish controlled and balanced blood flow to pulmonary circulation. *Id*. Stage II surgery is performed at 3-6 months and involves removing the shunt placed in Stage I and establishing a bidirectional Glenn shunt, enabling blood flow directly into pulmonary circulation. *Id*. at 6. The final surgery called **Fontan** is performed between 18 months and 4 years of age. The goal of Fontan circulation is for the right ventricle to pump blood directly into systemic circulation with pulmonary blood flow provided by passive flow. *Id*. at 2, 6. Some patients undergo **Fontan with fenestration**, where an opening called an atrial septal defect is surgically created to connect the atria thereby relieving interatrial obstruction. *Id*. at 4; *see also* Resp. Ex. A Tab 4 at 2.



Illustration from Anthony T. Bejjani et al., *Hypoplastic left heart syndrome (HLHS): molecular pathogenesis and emerging drug targets for cardiac repair and regeneration*, 25 Expert Opinion on Therapeutic Targets 621 (2021); *see also* Resp. Ex. I.

Though treatment options have improved, HLHS presents lifelong complications and is associated with high morbidity and mortality. Pet. Ex. 45 at 2-3; Resp. Ex. C Tab 1 at 1, 8. Little data exists on the quality of life of those who survive, but there is an increased risk of neurodevelopment impairment and decrease in exercise tolerance. Pet. Ex. 45 at 4; Resp. C Tab 1 at 8.

Furthermore, Fontan circulation itself "has negative long-term effects on other organ systems" and increases the risk of thrombotic events. Resp. Ex. A Tab 1 at 1; Resp. Ex. A Tab 2 at 1; Resp. Ex. C Tab 1 at 6, 8. **Thrombosis** refers to the development of a blood clot along the wall of a blood vessel often causing vascular obstruction. *Dorland's* at 1893. **Thromboembolism** is the obstruction of a blood vessel with thrombotic material carried by the bloodstream from the site of origin to plug another vessel. *Dorland's* at 1892. **Thrombostasis** is the stoppage or diminution of blood flow. *Dorland's* at 1893.

Thrombotic complications are associated with mortality, stroke, and pulmonary embolism. Pet. Ex. 45 at 4. There are several explanations offered for why thrombotic complications are more common amongst patients with Fontan circulation: low cardiac output resulting in "areas of sluggish flow" or stasis; the lack of the left ventricle for pulmonary circulation affecting coagulation by altering hepatic venous pressure; the use of synthetic material in the Fontan procedure; and chronic systemic venous hypertension. Resp. Ex. A Tab 1 at 4; Resp. Ex. A Tab 2 at 7, 9; Resp. Ex. C Tab 3 at 6; Resp. Ex. G Tab 3 at 3. "[T]he risk of thrombosis appears to persist throughout the patient's lifetime" in those with Fontan circulation. Resp. Ex. A Tab 2 at 5.

The literature filed in this case illustrates the risk of thrombotic events in HLHS patients post-Fontan.

*Firdouse* discussed the risks of "thrombosis" and "thromboembolic" complications for HLHS patients post-Fontan surgery. Pet. Ex. 44 at 1. The incidence of "thrombosis" in Fontan circulation is as high as 33%, with some suggesting the most significant time frame being immediately following the procedure and peaking in the first year, others observing a plateau after 3.5 years with a second peak after 10 years. *Id*. at 2. The discrepancy in long-term follow-up data is attributed to silent thrombosis events, asymptomatic cases, and decline over the first few post-operative years. *Id*. The incidence of "thromboembolism" ranges from 3% to 20% with both systemic venous and arterial thromboembolic complications associated with mortality rates of 25% in children and 38% in adults. *Id*. at 3. Increased prevalence has been observed in longer follow-up. *Id*. The authors concluded that the risk of thrombosis and thromboembolic events in Fontan patients remains high with a mortality rate of 38% once thromboembolic complications have "set in," even with aggressive intervention. *Id*. at 6, 7; *see also* Resp. Ex. C Tab 3.

*Jahangiri* concluded that "thromboembolism is an important cause of morbidity and may partly explain late death after [] Fontan operation." Resp. Ex. A Tab 1 at 5. *Rosenthal* observed that "thromboembolic events occurred from the perioperative period to 15 years after [Fontan] surgery," but the pathogenesis is unknown and clinical risk factors other than dehydration have not been identified. Resp. Ex. A Tab 2 at 1, 7, 9. *Rosenthal* also noted that the reported rate of thrombosis is likely a "minimum estimate of the true risk" since there is a high number of asymptomatic thromboses. *Id*. at 9. *Savitsky*, a retrospective study of 77 patients presenting to the

5

ER between 1993 and 1998 with an age range of 1 week to 16 years all with congenital heart defects, found that 20% had markedly limited pulmonary or systemic blood flow with extreme hypovolemia,[4] noting that dehydration may predispose these children to thrombosis and effective management requires an understanding of their anatomy, their baseline function, and their recent clinical course. Resp. Ex. C Tab 4 at 2-3, 6. *Fyfe* concluded that transesophageal echocardiography provides "a unique view of the caval-pulmonary connection and adjacent structures in patients after the Fontan operation," which has significantly enhanced the ability to diagnose thrombus formation undetected by regular transthoracic echocardiographic examination. Resp. Ex. A Tab 3 at 4; *see also* Resp. Ex. A Tab 4. *Alsaied* found a significantly lower incidence rate of thromboembolic events ("TE") post-Fontan with the use of aspirin or Warfarin as an anticoagulant, though thromboembolic event "incidence remains high in this patient population." Resp. Ex. A Tab 5 at 1, 4, 6.

*Deshpande* described a patient with post Fontan surgery at age 1.5 who suffered a clot of the venovenous collaterals at age 10, was then fine without any evidence of arrythmias, ventricular dysfunction, or liver dysfunction, until age 17 when he presented to the ER with several hours of chest pain and shortness of breath. Electrocardiogram revealed elevation of ST-segment[5] and elevated troponin[6] levels. Anticoagulants were administered and he was transferred to the cardiac ICU where mechanical support with Impella[7] was used until heart transplantation could be done. It was noted that patients with Fontan circulation have a higher risk of thromboembolic events, even sudden death, when coronary thrombolysis[8] and reperfusion[9] do not improve the myocardial dysfunction. Resp. Ex. A Tab 6 at 1.

A 2021 study by *Watkins* of 467 single-ventricle patients with native-to-neoaortic anastomoses documented in institutional databases between 2002 to 2017 revealed 9 patients (2%) with native aortic root thrombosis, all of whom had HLHS. The timing of thrombosis varied following each stage of single-ventricle palliation. Eight patients received systemic anticoagulation, and one patient did not receive any treatment. Three patients (33%) died in the follow up period. Among the 6 survivors, 4 had right ventricular systolic function that was mildly depressed or worse at a median follow up of 8.3 years. The authors found that the 6 patients with native aortic root thrombosis who survived had compromised ventricular function; however, they were not able to identify risk factors to "focus preventative therapies." Resp. Ex. G Tab 1 at 1.

In another 2021 study by *Rajab,* abnormal patterns of blood flow in HLHS patients were noted to possibly predispose them to native aortic root thrombosis ("NART") with hemodynamic changes seeming to be the main etiologic factor. While rare, all NART cases in the study involved HLHS patients. Myocardial ischemia is also seen in these patients if the antegrade flow is enough for ejection but too small for adequate perfusion. Further, single-ventricle patients are prone to hypercoagulability which may contribute to NART particularly in the acute post-operative state.

---

[4] Hypovolemia is abnormally decreased volume of circulating blood in the body. *Dorland's* at 896.

[5] ST segment refers to the interval from the end of ventricular depolarization to the onset of the T wave on an electrocardiogram. *Dorland's* at 1659.

[6] Troponin is a complex of globular muscle proteins that inhibits heart contraction. *Dorland's* at 1942.

[7] Impella is a device used for mechanical, temporary circulatory support to allow time for transplant candidacy evaluation. Resp. Ex. A Tab 6 at 1.

[8] Thrombolysis is the dissolution or destruction of a thrombus. *Dorland's* at 1075, 1893.

[9] Reperfusion is restoration of blood flow to an area or part that was temporarily ischemic. *Dorland's* at 1599.

Ventricular arrythmias, conduction abnormalities, or both, occurred in more than a third of patients and appeared to be the most prevalent presenting sign of NART. Resp. Ex. G Tab 2 at 1, 6, 8.

*Patel* discussed three cases of adolescent HLHS patients post-Fontan who presented within a 2-year period with acute clinical symptoms consistent with coronary artery ischemia due to NART and subsequent thromboembolic myocardial infarction. The authors noted that "[t]hromboembolic events are well-documented complications of Fontan physiology, and optimal prevention and treatment strategies are poorly defined." Resp. Ex. G Tab 3 at 1. All three patients in the study had sudden onset of acute chest pain and presented for treatment with varying results. *Id*. at 1-3. Thrombosis and thromboembolic complications are well described in post-Fontan patients, but NART post-Fontan in HLHS is "very uncommon." *Id*. at 3. While NART and thromboembolic events are described in case reports of HLHS patients after all stages of surgery, this study was the first case series to describe embolic myocardial infarction 10 years or more after Fontan operation. "There have only been 13 reported cases of [NART] in HLHS, of which only four occurred after the Fontan operation." *Id*.

A 2023 study by *Cantinotti* referred to NART as a "rare potential complication" in single-ventricle heart circulation "worrisome" for potential coronary occlusion, with resulting myocardial ischemia and sudden cardiac death or systemic embolism. The authors theorized that "[i]t may be due to low-flow dynamics inside the left cardiac chambers due to the preferential flow to the right heart chambers in the setting of unrestrictive atrial septal fenestration." Resp. Ex. H at 5-6; *see also* Resp. Ex. C Tab 1 at 4. Anticoagulation management was effective in most cases, reopening the debate for the need and type of anticoagulation used for HLHS patients. Resp. Ex. H at 6. "In fact, most (if not all) of the children who experienced native aortic thrombosis were under acetylsalicylic acid." *Id*.

Unfortunately, morbidity and mortality rates are high in HLHS patients. However, routine immunizations have not been reported to be associated with any adverse events in HLHS patients and indeed play an important role in protecting these patients. Resp. Ex. C Tab 1 at 1, 7.

### III.    Factual Background

#### A.  Medical History Prior to Receiving the Subject Vaccine

C.L.H. was born in 2008 with HLHS. He underwent the necessary three surgeries referred to as Norwood (on July 29, 2008) which was complicated by circulatory arrest, Glenn (on October 30, 2008) requiring revision and left pulmonary artery patch enlargement the next day, and Fontan with fenestration at age 3 (October 13, 2011) complicated by the development of pericardial effusion.[10] Pet. Ex. 12 at 32-34, 811.

He received routine medical care from a pediatrician and a cardiologist, Dr. Lanford. *See generally* Pet. Ex. 12; Pet. Ex. 17. On November 28, 2011, C.L.H. was presented to Dr. Lanford following the Fontan procedure and noted to be a 3-year-old born with HLHS status post-

---

[10] Pericardial effusion is the accumulation of more than 50 mL of pericardial fluid in the pericardium, the fibroserous sac that surrounds the heart and the roots of the great vessels. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 589, 1391 (33rd ed. 2020) [hereinafter *Dorland's*].

7

Norwood, -Glenn, and -Fontan complicated by the development of pericardial effusion. Pet. Ex. 12 at 32-34. His mother reported a "horrible cough" worse while sleeping, with "bubbling out" at his lower sternum when coughing. He was a picky eater, not particularly active, and preferred to sit and play on the computer. His color was "good." *Id*. at 32. His medications included daily Lasix, 81mg baby aspirin, and Aldactone.[11] *Id*. at 33. Echocardiogram on that date showed pericardial effusion, slightly larger than seen in the last echocardiogram. His right ventricular systolic function[12] was mildly decreased. There was trace-to-mild tricuspid insufficiency. *Id*. His pericardial effusion had failed to respond to ibuprofen or steroids, but the decision was made to wait before effusion draining. *Id*. at 34.

C.L.H. presented to cardiology on October 1, 2012 at age 4. Pet. Ex. 12 at 382-85. The records indicate he was last seen on February 5, 2012.[13] He was doing well and taking only one baby aspirin daily. His other medications must have been stopped but there is no such record. *Id*. at 385. Influenza vaccine was discussed but refused. *Id*. at 386. Mildly depressed systolic function seen on echocardiogram remained a concern. An ACE inhibitor was to be considered. *Id*.

C.L.H. was presented to the pediatrician on November 22, 2013 with concerns of C.L.H.'s frequent urination due to a family history of diabetes. Pet. Ex. 17 at 3-4. He next presented to the pediatrician on September 23, 2014 for a well child visit. *Id*. at 9. Petitioner reported frequent urination and nighttime urination, family history of diabetes, and leg pains at night. He self-regulated his activity in gym class and napped after school. *Id*. at 9-10. He had cavities and was under the care of a dentist. Mom understood the risks of dental cavities with heart disease. *Id*. at 10. Mom reported bluing of the lips during exercise and excessive fatigue. She was going to follow up with cardiology. *Id*. at 11. Risks and benefits of vaccinations were discussed. She reported that C.L.H. could not have live vaccines but was willing to give him the DTaP and pneumococcal vaccines but not the flu vaccine. She was to call and speak to the cardiologist about the flu vaccine. *Id*.

On June 2, 2014, C.L.H. presented to cardiology at 5 years of age. Pet. Ex. 12 at 338. Mom reported one year of knee pain before bed which improved with aspirin; eye swelling every morning for the past year that improves throughout the day; fatigue at times; and complaints that his "heart is pumping." His appetite was fair; his lips appear blue with significant exertion; he was presented to the ER in February 2014 for chest pain; EKG was at baseline, and he was sent home. He takes 81mg of aspirin daily. He was in kindergarten. *Id*. Dr. Lanford assessed him as doing well. *Id*. at 339. The mild swelling of the eyes needed to be watched. His right ventricle was dilated with decreased function, so enalapril[14] therapy was to be initiated. He was to continue taking aspirin and had no restrictions on activity. *Id*.

C.L.H. returned to Dr. Lanford on June 15, 2016 for recent decrease in activity level. A visit in December of 2014[15] was referenced.  Petitioner reported that he had been playing baseball,

---

[11] Aldactone is the trademark for spironolactone, a steroid. *Dorland's* at 46, 1722.

[12] Systolic function describes the contraction of the heart, especially that of the ventricles which force the blood into the aorta and pulmonary trunk. *Dorland's* at 1836.

[13] Records for this visit could not be located within the records filed.

[14] Enalapril is an angiotensin-converting enzyme inhibitor with antihypertensive and vasodilator actions, administered intravenously in the treatment of hypertensive crisis. *Dorland's* at 605.

[15] Records for any visit in December of 2014 could not be located.

running, and keeping up with his friends, but over the past 3-4 weeks he was no longer playing baseball and would come home from school and rest. He was up at night and slept during the day. His color was variable with no peripheral edema or syncope. He complained the week before that his heart was pumping "hard." Dr. Lanford noted shortness of breath, fatigue, poor exercise tolerance, chest pain, cyanotic[16] episodes, headache, nausea and vomiting, poor appetite, joint pain, and emotional problems. Pet. Ex. 12 at 82. He was taking 81 mg of aspirin daily. *Id*. at 83. He had decreased right ventricle systolic function, and lisinopril (an ACE inhibitor) was recommended. *Id*. at 84. An EKG that day was "normal for him," and echocardiogram showed his heart muscle squeeze mildly decreased. *Id*. at 77. Blood work for cardiac function was recommended along with a 24-hour Holter monitor to check heart rate variability and abnormal rhythm.[17] Lisinopril was to be started. *Id*.

C.L.H. returned to Dr. Lanford on December 21, 2016. His energy level was "okay," but he was not particularly active. He had no recognized cardiac complaints. Pet. Ex. 12 at 809. He took 81 mg of aspirin daily but had not taken the prescribed lisinopril. *Id*. at 810. Dr. Lanford wrote that children with Fontan circulation would likely not have the same energy level as a child with a four-chamber heart, and children with congenital heart disease often have subtle learning disabilities, "[i]n addition, he had a circulatory arrest as part of his Norwood surgery which can cause additional injury to the brain." *Id*. at 811. His right ventricle was "adequate." Return visit in 6 months was recommended. *Id*.

C.L.H. returned to Dr. Lanford 16 months later on April 30, 2018 at age 10, last seen in December of 2016. His bloodwork in June of 2016 was remarkable for mild polycythemia[18] and normal brain natriuretic peptide[19] at 17. Pet. Ex. 12 at 724. His school would not allow him to participate in gym. Dr. Lanford wrote that "[h]e has had complaints of chest pain localized to the left apical area. His mother reports that his color has been 'horrible.' He has had no history of syncope. He enjoys computer games such as PlayStation. In addition he likes playing baseball and basketball." Review of symptoms was positive for shortness of breath, fatigue, poor exercise tolerance, blue episodes, joint pains, dental problems, and emotional problems. Echocardiogram and electrocardiogram were performed. *Id*. at 725. The assessment was a 10-year-old with HLHS, status post-Fontan with concerning energy level, but "[c]hildren with Fontan circulation are most likely not going to have the same energy level as another child with a 4-chamber heart. However, [C.L.H.'s] systemic saturation is slightly lower than I would like at rest." *Id*. Dr. Lanford discussed doing a stress test with oxygen monitoring to assess his exercise capability and if there were significant desaturations to warrant closure of his Fontan. His hemoglobin showed cyanosis the last time, so updated tests were ordered. "Otherwise, cardiac evaluation is stable." Dr. Lanford discussed the importance of C.L.H. participating in gym and learning to self-limit his own activities. She also discussed the risk of liver disease in Fontan patients and recommended a complete metabolic panel and other diagnostic tests be done within the next several months. *Id*. He was to return in 6 months, continue with 81 mg of baby aspirin daily, and have the

---

[16] Cyanosis is a bluish discoloration, especially of the skin and mucous membranes due to excessive concentration of deoxyhemoglobin in the blood. *Dorland's* at 447.

[17] There were no records filed indicating that this testing was done.

[18] Polycythemia is an increase in red cell mass of the blood. *Dorland's* at 1465.

[19] Brain natriuretic peptide is a hormone, originally isolated from porcine brain tissue, having biologic effects similar to those of atrial natriuretic peptide; it is stored mainly in the myocardium of the cardiac ventricles. Blood levels of BNP are elevated in hypervolemic states such as congestive heart failure and hypertension. *Dorland's* at 1387.

recommended testing done. *Id*. at 725-26. It does not appear that any of the testing ordered was done.

C.L.H. presented to the pediatrician for a well child visit on August 24, 2018. Pet. Ex. 17 at 28-29.[20] He was noted to be in tears during the visit discussing school, that his heart condition scared him, and he could not do what others do. He did not feel normal and was nervous a lot of the time. Cardiology had cleared him to participate in gym and recess, but the school wanted a note from the PCP. He liked playing video games but not going outside. He was not very active. He enjoyed baseball and basketball at school, but mom took him out of organized baseball because he could not keep up with the other kids. He has friends and plays with his siblings. He was a picky eater and had difficulty keeping weight on. He had trouble sleeping. His vision test was abnormal. *Id*. He received the ProQuad ("MMRV") vaccine at this visit "in the presence of mother. No reactions noted." *Id*. at 31.

C.L.H. received all his routine childhood vaccinations without event including influenza vaccines on October 20, 2009, November 20, 2009, and December 4, 2012. He received his first MMR vaccine on May 7, 2010. Pet. Ex. 56. The subject August 24, 2018 MMRV vaccine was his second MMR vaccine and first Varicella vaccine. *Id*. He also received monthly Palivizumab[21] (Synagis) vaccinations from 2008 through 2010. Pet. Ex. 31 at 5-6.

## B. Medical History After Receiving the Subject Vaccine

On August 30, 2018, six days after the MMRV vaccination, C.L.H. was presented to the ER. He was noted to be a 10-year-old with HLHS status post-Fontan repair with 5 days of malaise. His mother reported receipt of an MMRV vaccine on August 24. Five days ago, he began feeling tired and was lying around the house. He vomited twice with reduced appetite and water intake. He had no fever, rash, diarrhea, chest pain, palpitations, dizziness, or syncope. Pet. Ex. 9C at 2210. On examination, there was no rash associated with any MMRV diseases noted and "[h]is reaction is more extreme than likely to be a vaccine response. His [normal] vital signs are reassuring vs heart failure." *Id*. at 2211. The diagnosis was likely a viral syndrome. *Id*. He was well appearing, with good intake, and no dizziness, throat pain, abdominal pain, or weakness. *Id*. at 2212. Cardiology was consulted. He was discharged with instructions to follow up with his PCP if he worsened or if his symptoms failed to resolve within a week. *Id*. at 2211. Blood work revealed elevated neutrophils and monocytes. *Id*. at 2211-12.

C.L.H. returned to the ER on September 2, 2018, with nausea, vomiting, and left-sided chest pain that radiated to his neck since that morning. He said that it felt like "someone was stabbing him" in the chest. He did not have syncope, shortness of breath, or palpitations. Pet. Ex. 10 at 550. Mom reported "recurrent chest pain in last almost a year with complaints of chest pain with activity and [history of] 'change in color'/pallor with activity. He can no longer play as much as he used to." EKG showed "ST changes." Troponin levels were elevated and concerning for myocarditis. *Id*. C-reactive protein ("CRP") was 0.81 milligrams/deciliter on a reference range of 0.06 to 0.79. Pet. Ex. 8 at 237. IVIG was ordered. Pet. Ex. 9C at 2235. Chest X-ray and echocardiogram were consistent with decreased cardiac function. He was admitted to cardiac

---

[20] The pages in exhibit are labeled as Exhibit 27 rather than 17 as designated. For clarity, Exhibit 17 will be used.
[21] Palivizumab is an antibody directed against respiratory syncytial virus ("RSV"). *Dorland's* at 1344.

intensive care ("CICU") for observation and evaluation. Pet. Ex. 10 at 550. While asking for food a few hours later, he developed chest pain, difficulty breathing and swallowing. He became unresponsive with incontinence. Chest compressions and resuscitation efforts were started. He was in ventricular tachycardia[22] requiring defibrillation. He was given two doses of epinephrine. He was intubated and returned to spontaneous circulation with acceptable blood pressure and oxygen saturations in the low 90s. *Id.*; *see also* Pet. Ex. 15 at 384.

C.L.H. was then taken to the catheterization ("cath") lab on September 4, 2018 for angiogram.[23] The findings included:

**Angiogram Descriptions**
1. Neoaortic root angiogram demonstrates mild neoaortic insufficiency. Contrast also fills the native aortic root. The proximal right and left coronary artery course appears normal. The origins are not well seen. There is no evidence of aortic coarctation.There are old coils from prior aortopulmonary collaterals, but no significant collaterals are seen now. The native aorta fills retrograde with no motion of the aortic valve leaflets. Of note the contrast hangs around a globular shadow within the native, which likely represents thrombus.
2. Native aortic root angiogram demonstrates no native aortic valve insufficiency, indeed aortic valve does not move, consistent with acquired atresia. The right coronary artery course appears normal. The left coronary artery is not well seen.Although at the start of the injection one can see LMCA filling , as the contrast fills the native further, the left coronary artery does not fill at all, suggesting that thrombus may have moved towards the LCA origin.
3. Left coronary artery selective angiogram shows complete occlusion of the proximal LCA. With the catheter at the mouth of the LCA, there is distal filling the left system. The circumflex terminates abruptly. The LAD appears normal.
4. PTCA is performed of the left main CA, with wire into the circumflex. Repeat selective left coronary artery angiogram again shows complete occlusion of the proximal LCA.
5. Series of stored fluoroscopy demonstrating a 3mm x 12 cm Apex balloon positioned across the area of occlusion and inflated. First inflation was done by hand and the second to a pressure of 4 atms.
6. Repeat native aortic root angiogram does not fill either the right or left coronary artery.
7. Angiogjet is performed int he proximal LCA.
8. Repeat native aortic root angiogram does not fill either the right or left coronary artery.

Pet. Ex. 15 at 46. The findings included but were not limited to a globular shadow in the native aorta, likely to be a thrombus, and complete occlusion of the proximal left coronary artery ("LCA"). *Id.* The diagnosis after angiogram included the following:

---

[22] Ventricular tachycardia, or V-tach, is an abnormally rapid ventricular rhythm with aberrant ventricular excitation (wide QRS complexes), usually in excess of 150 per minute. *Dorland's* at 1838-39.
[23] Angiogram is a radiograph of blood vessels. *Dorland's* at 83.

11

**Diagnosis**

1. Hypoplastic left heart syndrome consisting of aortic and mitral stenosis.
     A. Status post Norwood with 3.5 mm BT shunt performed by Dr. Peter Wearden on July 29, 2008.
     B. Status post bidirectional Glenn on October 30, 2008, by Dr. Wearden.
     C. Status post revision of the Glenn and left pulmonary artery patch augmentation on October 31, 2008, by Dr. Wearden.
     D. Status post extracardiac fenestrated Fontan with 18 mm conduit by Dr. Peter Wearden on October 13, 2011.
2. Mildly hypoplastic left pulmonary artery, status post patch enlargement-- improved post-revision of Glenn procedure.
3. Diaphragm paresis status post plication.
4. History of gastroesophageal reflux disease in infancy.
5. History of moderate-sized pericardial effusion after Fontan procedure.
     A. History of poor response of pericardial effusion to ibuprofen or steroids.
     B. Status post pericardiocentesis on December 22, 2011.
6. History of significant dental caries.
7. Recent cardiac arrest associated to a troponin leak
8. Acquired aortic atresia with native aortic thrombosis (mobile thrombus which occluded the left coronary ostia)
9. Failed angioject coronary thrombolysis
10. Bradycardia, heart block and cardiac arrest requiring CPR and ECMO cannulation.
11. Distal obtuse marginal obstruction (possibly chronic, given the sudden change in caliber).
12. Displacement of thrombus into distal LAD
13. PTCA of LMCA, Circumflex, Obtuse Marginal, and LAD, including implantation of 2 overlapping Xience Sierra Everolimus-eluting 2.25 coronary artery stents in the LAD by  Dr. Fowler, and Dr. Lee/

Pet. Ex. 15 at 48. Important findings were "[a]cquired aortic atresia[24] with native aortic thrombosis (mobile thrombus which occluded the [left coronary artery])" and thrombus of the distal left anterior descending ("LAD") artery. Pet. Ex. 15 at 46-49; *see also* Pet. Ex. 10 at 579-80. Two drug eluting stents were placed in the LAD. Pet. Ex. 15 at 48. The rise in troponin "was determined to be from a complex occlusion of the proximal LCA . . . this thrombus likely had formed in the native aorta." *Id*. at 48-49. Myocarditis was ruled out, and the order for IVIG was cancelled. Pet. Ex. 9C at 2235; Pet. Ex. 15 at 22. There is no mention of vasculitis.

As noted above, C.L.H. developed hypotension and bradycardia during the angiogram, required chest compressions, code medications, and extracorporeal membrane oxygenation also known as extracorporeal life support or "ECMO" cannulation. Pet. Ex. 10 at 580.

C.L.H. remained on ECMO for several weeks with failed attempts to wean him due to hypoxia[25] and poor systolic function. On September 19, 2018, a ventricular assist device ("VAD") was placed for palliative care and a bridge to heart transplant. Pet. Ex. 10 at 580. The Fontan was closed on September 21, 2018. Orthotopic heart transplant, aortic arch reconstruction, and left diaphragm plication was performed on February 9, 2019 with stent placement on February 27, 2019. Pet. Ex. 31 at 17-18, 21; Pet. Ex. 24A at 5. While in the hospital, C.L.H. tested positive for 4G/5G genetic mutation, which is associated with increased risk of thrombosis. Pet. Ex. 8 at 17-18.

His post-heart transplant course was "complicated by tracheal stenosis s/p balloon tracheoplasty x2 (last in June 2019), depression, and recalcitrant verruca vulgaris of the hands and

---

[24] Aortic atresia is defined as the absence or closure of the aortic orifice of the heart, a rare congenital anomaly in HLHS. *Dorland's* at 171.

[25] Hypoxia is reduction of oxygen supply to tissue below physiologic levels despite adequate perfusion of the tissue by blood. *Dorland's* at 896.

12

feet."[26] He required a pacemaker for complete heart block. Pet. Ex. 55 at 205.

A November 2019 routine health evaluation documents C.L.H.'s immunizations being up to date including receipt of Menactra and flu vaccines but not another MMR vaccine. "[M]om tearfully states she is still working through her thoughts on vaccines . . . mom then reveals that one of her children 'died 4 days after receiving MMR; the test results were 'inconclusive.'" Pet. Ex. 31 at 30-31.

In February of 2023, C.L.H. was hospitalized for five days of IV steroids and milrinone[27] support while treating "3A/2R [acute cellular rejection]."[28] A follow up biopsy showed improvement to "1B ACR with features of [antibody-mediated rejection) on MMDx. LVEF is slowly improving but remains mildly depressed."[29] Pet. Ex. 55 at 205.

Thereafter, C.L.H. was able to shoot baskets in gym but could not play basketball. He had no chest pain, shortness of breath, palpitations, dizziness, or syncope. He had good energy with variable appetite but "still does not hydrate well." Pet. Ex. 55 at 205. His examination was mostly normal/negative. *Id*. at 205-06.

In March of 2023, C.L.H. was described as a 14-year-old with HLHS status post-failed single ventricle palliation requiring a heart transplant in February of 2019. He was to continue taking prednisone. His echocardiogram was slightly improved from last month. His medication adherence had improved, but a lengthy discussion of the consequences of not taking his medication was had. On that date, he had a 2 weak class I DSA with rejection not previously seen at his February 17 visit which needed to be watched. He had no arrhythmia recently, was pacemaker dependent, and had a reassuring stress test in 2022, but was restricted from moderate to high intensity exercise for the next six months. Pet. Ex. 55 at 207.

### C. Petitioner's Affidavit and Testimony

Petitioner is C.L.H.'s mother and testified at the hearing. Pet. Ex. 29; Tr. 13.

Petitioner learned that C.L.H. had HLHS at about 26 weeks into her pregnancy. She was told he would need three surgeries to repair it, but with some monitoring he would be okay. Tr. 13. She understood that activities like sports would be an issue because of his oxygen levels. There were never any issues. Tr. 14.

Petitioner stated that Dr. Lanford exempted C.L.H. from receipt of the MMRV vaccine when he was around 2[30] because he was taking aspirin and she didn't want to take him off aspirin. Tr. 14. C.L.H. had been taking aspirin since birth, "so his blood thinned out to go through the stent." Tr. 14-15.

---

[26] Verruca vulgaris is another word for a common wart. *Dorland's* at 2020, 2044.
[27] Milrinone is used to treat congestive heart failure. *Dorland's* at 1151.
[28] Rejection refers to the body's immune response against grafted (transplanted) tissue that may result in failure of the graft to survive. *Dorland's* at 1596.
[29] This was the same as prior to C.L.H.'s receipt of the MMRV vaccine.
[30] C.L.H. received his first MMR vaccine at 21 months. Pet. Ex. 56 at 2.

Petitioner testified that C.L.H. was examined by Dr. Lanford on April 30, 2018 and was "doing good . . . starting to become a little more concerned about playing sports with the kids in the gym and he was starting to ride quads and things like that . . . getting a little flustered when he was exceeding his oxygen." Tr. 16. Dr. Lanford mentioned doing a stress test but "they said everything looked good," including the echo, his pump, and pressures. There were no concerns. Tr. 16. She could not recall if blood work was done but the stress test was not done. Tr. 17-18. Dr. Lanford never discussed any underlying clotting issue. Tr. 18-19.

Petitioner affirmed that C.L.H. received his first MMRV vaccine at a routine pediatric checkup on August 24, 2018. ECF No. 64 at 1. Before that appointment he was "doing really well." Tr. 19. She looked back at her pictures and videos from that time, and there was only an issue with his color when he was "over-exhausted" but otherwise "he looked perfectly fine in every video, every picture. We had no concerns . . . Everything was going great."[31] Tr. 19. Petitioner affirmed that visit was with a new pediatrician and that she told three different people that he could not have the MMRV vaccine. No one told her that he was given it that day.[32] Tr. 19-20.

According to petitioner, the "very next day," C.L.H.'s "lips, the color" like "the anxiety, the heart racing . . . was messing with his color a little bit," but she thought it was nerves about going back to school. Tr. 20. Two or three days after August 24, 2018, he started vomiting. Tr. 20-21. She sent him to school but was called to pick him up. She stated that she called the pediatrician and asked what vaccines he had received because he was not "a puker" and that was when she was informed that he received the MMRV and two other boosters.[33] She responded that he was not supposed to receive the MMRV and was told to go to the ER. Tr. 21. Petitioner stated they were in the ER for 2-3 hours, told he had low iron, and sent home. Tr. 21.

However, in her pre-hearing affidavit, petitioner affirmed that it was three days post-vaccine, "[s]pecifically, on August 27, 2018," that C.L.H. had "symptoms of blue lips, white face and was lethargic." She did not mention vomiting. His symptoms persisted, and she called the pediatrician on August 29 to find out what vaccine had been given. ECF No. 64 at 2.

At hearing she stated that he then "just slept and slept. It was [] two days of nonstop throwing up. And they're telling me that his iron was low . . . I just figured maybe it was a virus." Tr. 22. On September 2, 2018, C.L.H. woke her; he had no color in his face, his lips were pale, and he was gasping for air. She took a picture of him and sent it to her mother saying, "something's not right." Her mother told her to go to ER. She stated that C.L.H. was "gasping for air" the entire ride there, but no one took her seriously. They waited for 30 minutes before they took him to a room, then an hour before anyone saw him because they were waiting for a specific doctor. Tr. 22-23. C.L.H. started screaming that he couldn't hear or see. A nurse came and started CPR, then all the doctors came. When C.L.H. woke up, she was told to keep him awake. Then "the bed dropped and they started intubating him and taking him out of the room." She didn't see him again until he came back on ECMO. He stayed in the hospital on ECMO until February when he had the heart

---

[31] Petitioner did not file any of the photographs or videos. His medical record includes that she reported his color to be "horrible" at the April 30, 2018 cardiology appointment. Pet. Ex. 12 at 724.

[32] Petitioner did not explain what prompted her to advise three different people that day that C.L.H. could not have the MMRV vaccine or how it came about that he was vaccinated without her consent.

[33] C.L.H. received only the MMRV vaccine on that date in the presence of his mother.

14

transplant. Tr. 23-24.

Petitioner stated C.L.H. has done well since the heart transplant, other than a lot of mental health issues. Tr. 23-24. He was hospitalized for 11 days for a rejection issue. Tr. 24.

### D. Affidavit of Dr. Lanford

Dr. Lanford is C.L.H.'s cardiologist. She affirmed that on April 30, 2018, C.L.H. demonstrated normal sinus rhythm with a stable cardiac evaluation. He was active for his condition, playing baseball, basketball, and participating in gym class in school.[34] Pet. Ex. 40 at 1. She affirmed "there was no evidence that [C.L.H.] was at risk for the development of coronary thrombosis, heart failure, or the need for a heart transplant."[35] *Id*.

According to Dr. Lanford, left coronary artery thrombosis is a rare development in children with hypoplastic left heart syndrome, and there were no clinical findings in April of 2018 to suggest that he was at risk for developing this condition or heart failure. Pet. Ex. 40 at 2.

## IV.    Experts' Opinions

### A. Petitioner's Expert, Dr. Howard Weber[36]

Dr. Weber submitted an affidavit, second affidavit, responsive second affidavit, narrative report, final narrative report, and post-hearing report. Pet. Ex. 2; Pet. Ex. 33; Pet. Ex. 39; Pet. Ex. 41; Pet. Ex. 50; Pet. Ex. 57. He also testified at the hearing.

Dr. Weber's initial theory involved Reye's Syndrome.[37] Following Dr. Weber's testimony at hearing, the parties stipulated that petitioner was no longer raising Reye's Syndrome as a theory, therefore the portions of Dr. Weber's opinions associated with Reye's syndrome will not be included in this Decision unless necessary for context. Tr. 69-70.

Dr. Weber asserted that the MMRV vaccine—a combined live virus vaccine containing measles, mumps, rubella, and varicella—has serious but rare side effects including vasculitis, which is an inflammation of the blood vessels which can cause the blood vessel walls to thicken

---

[34] The affidavit is contrary to her office record for that that day which included that his school would not permit him to participate in gym and that he had complaints of chest pain. He was positive on that date for shortness of breath, fatigue, poor exercise tolerance, and blue episodes. Pet. Ex. 12 at 724. Dr. Lanford also documented that he had a concerning energy level and low systemic saturation at rest. *Id*. at 725.

[35] This too is inconsistent with her record for that date, as she ordered a stress test with oxygen monitoring to assess exercise capability and if there were significant desaturations that would warrant closure of his Fontan. She also ordered a complete metabolic panel, including liver function tests, gamma GTP, INR, and abdominal ultrasound with liver elastology. Pet. Ex. 12 at 725.

[36] Dr. Weber is a professor of pediatrics at Pennsylvania State University. He obtained his M.D. in 1983 and completed his residency in general pediatrics followed by a fellowship in pediatric cardiology. He is board-certified in pediatrics with sub-board in pediatric cardiology. Pet. Ex. 34.

[37] Reye Syndrome is a rare, acute, sometimes fatal disease of childhood, characterized by recurrent vomiting and elevated serum transaminase levels, with distinctive changes in the liver and other viscera; an encephalopathic phase may follow with acute brain swelling, disturbances of consciousness, and seizures. It most often occurs as a sequela of chickenpox or a viral upper respiratory infection. *Dorland's* at 1816.

and narrow, cutting off vital blood supply to tissues and organs. It can cause blood clots that obstruct blood flow. Pet. Ex. 41 at 3; Pet. Ex. 46. The basis for his theory is that the MMR vaccine[38] package insert includes vasculitis as an adverse reaction, meaning that vasculitis was reported during clinical trials. Pet. Ex. 41 at 3-4; Pet. Ex. 47; Pet. Ex. 51; Tr. 34-35.

According to Dr. Weber, the MMRV vaccine caused an inflammatory response, which propagated the development of thrombosis in the arterial vessels of the reconstructed or neo-aorta (the location of the Norwood procedure) where there is potentially stagnant flow during parts of the cardiac cycle, resulting in cardiac arrest and the need for a heart transplant. Pet. Ex. 39 at 2; Tr. 67. He explained that the heart has two sides of circulation, the venous side and the arterial side. Tr. 51. While thrombotic events are unusual for both sides post-Fontan, it more commonly develops in the venous side. In his experience, thrombosis on the arterial side would be "extremely rare" and could "only temporally be attributable to the administration of the MMRV vaccine." Tr. 48, 51; Pet. Ex. 39 at 3.

Dr. Weber agreed that thromboembolic events are generally sudden and acute, but it is possible that it could be delayed. Tr. 68.

Dr. Weber acknowledged his theory has not been subject to peer review, but submitted that cardiac events in HLHS patients post-MMRV are "so rare that there is virtually no way to subject this to peer review." Pet. Ex. 41 at 4; Tr. 47. He asserted that his theory is "plausible," given the temporal relationship, the inflammatory markers in the post-IVIG lab work, the literature discussing infections causing vasculitis, and the package insert for the MMRV vaccine listing vasculitis as an adverse event. Tr. 45-48, 62-63, 68. Additionally, Dr. Weber submitted that C.L.H. was treated for an inflammatory response like vasculitis because he was prescribed IVIG. Tr. 66. Given the foregoing, he opined that the "MMRV vaccine was a substantial factor in causing a diffuse inflammatory response [] which led to this thrombotic event resulting in heart failure and the subsequent need for cardiac transplantation." Pet. Ex. 50 at 3. This, combined with the temporal relationship, supports his conclusion that "the cause of [C.L.H.]'s injuries are linked to the administration of the MMRV vaccine on August 24, 2018." *Id*.; Tr. 45, 54.

## B. Respondent's Expert, Dr. Scott Yeager[39]

Dr. Yeager wrote five reports in this case and testified at hearing. Resp. Ex. A; Resp. Ex. E; Resp. Ex. F; Resp. Ex. G; Resp. Ex. J. Those portions of Dr. Yeager's written opinions and testimony related to Reye's Syndrome will not be discussed, as it is no longer offered as a theory in this case. Tr. 69-70.

According to Dr. Yeager, HLHS patients are at lifelong and high risk of thromboembolic complications, such as myocardial infarction and heart failure, when compared to the general

---

[38] The package insert filed and relied upon was the MMR II vaccine, not the MMRV vaccine C.L.H. received. Pet. Ex. 47. The package insert for the ProQuad MMRV vaccine was filed as Court Exhibit ("Court Ex.") 1.

[39] Dr. Yeager obtained his M.D. in 1975 and completed his residency in pediatrics followed by a research fellowship in pediatric cardiology. He is board-certified in pediatrics with sub-board in pediatric cardiology and is currently the Division Chief of Pediatric Cardiology and professor of pediatrics and University of Vermont School of Medicine. Resp. Ex. B.

population. Although rare, rarity is not the issue here, the etiology of the event is. Resp. Ex. A at 4-6; Resp. Ex. F at 1, 2; Tr. 78. Literature supports both venous and arterial thrombosis in HLHS patients with coronary artery involvement. Resp. Ex. E at 1-2; Resp. Ex. A Tab 1; Resp. Ex. A Tab 2; Resp. Ex. A Tab 3; Resp. Ex. A Tab 4; Resp. Ex. A Tab 5; Resp. Ex. A Tab 6; Resp. Ex. A Tab 7; Tr. 78, 90, 101. Dr. Yeager agreed that blood clots are more commonly found on the venous side of the heart. There is no literature that supports MMRV vaccine causing thromboembolic events. Tr. 90.

Dr. Yeager agreed there was a temporal relationship between receipt of the MMRV vaccination and the cardiac event, but temporal relationship is not evidence of causation; Fontan patients who suffer thromboembolic complications are often well prior to the acute onset of symptoms; medical literature describes multiple cases of Fontan patients who develop acute coronary thrombosis; there is no evidentiary support for an association between MMRV and clotting complications, hypercoagulability, or thrombotic complications; and there is no evidence in the medical records that C.L.H. suffered vasculitis. Resp. Ex. E at 2; Resp. Ex. F at 2; Tr. 104-05.

Dr. Yeager argued that petitioner did not present a plausible mechanism implicating MMRV vaccine with the clinical events in this case. Resp. Ex. F at 3. Based on all the evidence, the MMRV vaccine was not related in any way to the catastrophic cardiac events that occurred. Tr. 75, 94.

## C. Respondent's Expert, Dr. Chris Liacouras[40]

As a pediatric gastroenterologist and pediatrician, Dr. Liacouras' focus was on the portion of Dr. Weber's theory which included Reye's Syndrome in children. Dr. Liacouras was not called to testify at hearing once the parties stipulated that Reye's Syndrome was no longer a theory to be considered in this case. Tr. 69-70.

Dr. Liacouras discussed infections as a cause of worsening heart disease in patients with a history of complex heart issues and that viral infections can become life-threatening in HLHS patients. Therefore, "immunizations are an essential part of their healthcare." Resp. Ex. C at 4. He argued that "[r]outine immunization in patients with HLHS have not been reported to be associated with any increased adverse outcomes." Specifically, the MMRV vaccine is not associated with Reye's Syndrome or worsening heart disease. *Id*.

## V.   The Parties' Arguments

## A. Petitioner's Pre-Hearing Briefs

---

[40] Dr. Liacouras obtained his M.D. in 1985, followed by residency in pediatrics and a postdoctoral fellowship in pediatric gastroenterology and nutrition. He is board-certified in pediatrics with sub-board in pediatric gastroenterology and is currently a professor of pediatrics at University of Pennsylvania School of Medicine. Resp. Ex. D.

Petitioner submitted that in order to prove causation in fact, she was required to satisfy *Shyface* and *Althen*.[41] Petitioner's Pre-hearing Brief ("Pet. Brief") at 2.

Petitioner asserted that C.L.H. was born with HLHS, successfully treated with the three surgeries to correct his congenital heart defect and was doing well as evidenced by his April 30, 2018 cardiology visit months prior to his August 24, 2018 MMRV vaccination. Pet. Brief at 3.

He was maintained on a daily regimen of aspirin to prevent clotting "within the Fontan circuit (venous pathway) and not the systemic arterial pathway," which was the site of the C.L.H.'s injury. Pet. Brief at 3.

Petitioner disagreed that C.L.H. suffered the natural progression of HLHS. Rather, as Dr. Weber opined, C.L.H.'s cardiac physiology was stable pre-vaccination, the cardiac events followed the MMRV vaccination, the anatomic location of thrombosis was rare and in fact "may be the first time in history that something like this has occurred," but "[t]he rarity of this condition does not preclude [p]etitioner from entitlement in this matter as, even though rare, [p]etitioner was injured following the administration of the vaccine." Pet. Brief at 7-8.

Petitioner postured that Dr. Weber's medical theory was scientifically reputable connecting the MMRV vaccine to the injury suffered by C.L.H. Pet. Brief at 8. Further, literature supports that the introduction of any live virus into the body can cause an inflammatory response, such as vasculitis, involving blood vessels leading to thickening and narrowing resulting in diminished blood supply to organs and tissues. *Id*. at 8-9; Pet. Reply at 4. Vasculitis is "a noted side effect from the MMRV vaccine . . . [and] can be limited to a single organ or can be multisystem with multiple manifestations." Pet. Brief at 9; Pet. Reply at 4. There is no diagnostic test for vasculitis. *Id*. Prior to his vaccination, C.L.H. was not at risk for thrombosis, cardiac arrest, or heart failure. He was stable with normal sinus rhythm. The onset of petitioner's symptoms "just days" after the administration of the MMRV vaccine provides the temporal relationship and explanation for the events causing his injury. Pet. Reply at 9-10. The MMRV was the "only new medication, illness, or substance introduced," making it reasonable to conclude based on timing that the MMRV resulted in his injuries. *Id*. at 10.

Finally, Dr. Weber "excludes other non-vaccine potential causes . . . by asserting that [C.L.H.]'s pre-existing congenital heart defect could have contributed to the injury" but it is "highly unlikely" that this injury would have occurred at his age and eight years after the final Fontan procedure. Pet. Brief at 10. Further, pathology of the explanted heart[42] makes no mention of thrombus in the native ascending aorta or anatomical description of the area. Therefore, there is no support for the theory that the clotting developed in the native ascending aorta. *Id*.

Petitioner's counsel also made an opening statement at the entitlement hearing. Tr. 6-11. Counsel summarized C.L.H.'s difficult medical course throughout his life and argued that the

---

[41] C.L.H. was diagnosed with a viral infection on August 30, 2018, six days after receipt of the MMRV vaccine. During a status conference, a discussion took place regarding the viral infection and the potential for a *Shyface* analysis. Petitioner was never advised that she was required to "satisfy" *Shyface* to prove causation-in-fact. ECF No. 42.

[42] C.L.H.'s heart was explanted six months after the events.

18

MMRV vaccine he received caused him to suffer an aortic root and left coronary artery thrombosis which in turn caused his cardiac arrest and necessitated heart transplant. The MMRV vaccine was a substantial factor in bringing about the injury based on "timing of the administration [of the vaccination], timing of [C.L.H.]'s symptoms, and the presentation of [his] injuries." Tr. 9.

### B.  Respondent's Pre-Hearing Brief

Respondent detailed C.L.H.'s medical history before and after his receipt of the MMRV vaccination. Respondent's Pre-hearing Brief ("Resp. Brief") at 2-8.

He addressed Dr. Weber's initial theory involving Reye's Syndrome and noted that C.L.H. was never diagnosed with Reye's Syndrome. Resp. Brief at 8-10.

Respondent addressed Dr. Weber's other theory that an inflammatory process like vasculitis triggered by the live vaccine caused arterial thrombi resulting in obstruction to coronary artery blood flow, stating that the evidence did not support that C.L.H. suffered from vasculitis following receipt of the MMRV vaccine. Resp. Brief at 10-13. Further, the literature filed does not indicate that vasculitis is associated with the MMRV vaccination. *Id*. at 12, 16-17. Routine vaccinations have not been associated with any adverse outcomes in HLHS patients. *Id*. at 20.

The literature does show that thrombosis, including in the native aortic root, is a known complication seen in HLHS patients with Fontan circulation like C.L.H. Resp. Brief at 15, 18. In addition to C.L.H. being at risk of thrombosis due to his heart condition and Fontan circulation, he also was found to have a genetic mutation associated with increased risk of thrombosis. *Id*. at 17.

### VI.    Legal Standards

### A.  Legal Standard Regarding Causation

The Vaccine Act provides two avenues for petitioners to receive compensation. First, a petitioner may demonstrate a "Table" injury—i.e., an injury listed on the Vaccine Injury Table that occurred within the provided time period. § 11(c)(1)(C)(i). "In such a case, causation is presumed." *Capizzano v. Sec'y of Health & Human Servs.*, 440 F.3d 1317, 1320 (Fed. Cir. 2006); *see* § 13(a)(1)(B). The second avenue for petitioners to receive compensation, where the alleged injury is not listed on the Vaccine Injury Table, is an "off-Table" injury, which requires that the petitioner "prove by a preponderance of the evidence that the vaccine at issue caused the injury." *Capizzano*, 440 F.3d at 1320; *see* § 11(c)(1)(C)(ii). Initially, a petitioner must provide evidence that he or she suffered, or continues to suffer, from a definitive injury. *Broekelschen v. Sec'y of Health & Human Servs.*, 618 F.3d 1339, 1346 (Fed. Cir. 2010); *Lombardi v. Sec'y of Health & Human Servs.*, 656 F.3d 1343, 1353 (Fed. Cir. 2011). A petitioner need not show that the vaccination was the sole cause, or even the predominant cause, of the alleged injury; showing that the vaccination was a "substantial factor" and a "but for" cause of the injury is sufficient for recovery. *See Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006); *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352 (Fed. Cir. 1999).

To prove causation for an "off-Table" injury, petitioners must satisfy the three-pronged test established in *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274 (Fed. Cir. 2005). *Althen* requires that petitioners show by preponderant evidence that a vaccination caused his or her injury "by providing: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." *Id.* at 1278. Together, these prongs must show "that the vaccine was 'not only a but-for cause of the injury but also a substantial factor in bringing about the injury.'" *Stone v. Sec'y of Health & Human Servs.*, 676 F.3d 1373, 1379 (Fed. Cir. 2012) (quoting *Shyface*, 165 F.3d at 1352-53).

Each of the *Althen* prongs requires a different showing. The first *Althen* prong requires petitioner to provide a "reputable medical theory" demonstrating that the vaccines received *can* cause the type of injury alleged. *Pafford*, 451 F.3d at 1355-56 (citation omitted).

The second *Althen* prong requires proof of a "logical sequence of cause and effect." *Capizzano*, 440 F.3d at 1326 (quoting *Althen*, 418 F.3d at 1278). In other words, even if the vaccinations can cause the injury, petitioner must show "that it did so in [this] particular case." *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 962 n.4 (Fed. Cir. 1993) (citation omitted). "A reputable medical or scientific explanation must support this logical sequence of cause and effect," *id.* at 961 (citation omitted), and "treating physicians are likely to be in the best position to determine whether a logical sequence of cause and effect show[s] that the vaccination was the reason for the injury," *Paluck v. Sec'y of Health & Human Servs.*, 786 F.3d 1373, 1385 (Fed. Cir. 2015) (quoting *Andreu*, 569 F.3d at 1375).

To satisfy the third *Althen* prong, petitioner must establish a "proximate temporal relationship" between the vaccination and the alleged injury. *Althen*, 418 F.3d at 1281. This "requires preponderant proof that the onset of symptoms occurred within a timeframe for which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation-in-fact." *De Bazan v. Sec'y of Health & Human Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008).

A petitioner may also be eligible for compensation if the vaccinee had a preexisting condition that was significantly aggravated by a vaccine. *See* § 11(c)(1)(C). In considering a significant aggravation claim for an on-Table injury, the Federal Circuit placed the most significance on whether petitioner's symptoms began within the time period prescribed. *Whitecotton v. Sec'y of Health & Human Servs.*, 81 F.3d 1099, 1107 (Fed. Cir. 1996) ("Instead of asking whether the person's symptoms would have occurred absent the vaccine, our test hoves (sic) close to the statutory mandate, and relieves a petitioner of the burden of proving causation if she can show that the first symptom or manifestation of the significant aggravation of her condition occurred within the table time period provided in the statute.").

For a significant aggravation claim for an off-Table injury, the petitioner's burden is expanded to six elements, requiring petitioner to show, by preponderant evidence,

(1) the person's condition prior to administration of the vaccine, (2) the person's current condition (or the condition following the vaccination if that is also

20

pertinent), (3) whether the person's current condition constitutes a "significant aggravation" of the person's condition prior to vaccination, (4) a medical theory causally connecting such a significantly worsened condition to the vaccination, (5) a logical sequence of cause and effect showing that the vaccination was the reason for the significant aggravation, and (6) a showing of a proximate temporal relationship between the vaccination and the significant aggravation.

*Loving ex rel. Loving v. Sec'y of Health & Human Servs.*, 86 Fed. Cl. 135, 144 (2009). The fourth, fifth, and sixth factors are derived from the *Althen* prongs. *Id*. The Federal Circuit has agreed with this approach. *See W.C. v. Sec'y of Health & Human Servs.*, 704 F.3d 1352, 1357 (Fed. Cir. 2013) ("We hold that the *Loving* case provides the correct framework for evaluating off-table significant aggravation claims.")

## B. Fact Finding

The process for making determinations in Vaccine Program cases regarding factual issues begins with analyzing the medical records, which are required to be filed with the petition. § 11(c)(2). Medical records created contemporaneously with the events they describe are generally considered to be more trustworthy. *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *but see Kirby v. Sec'y of Health & Human Servs.*, 993 F.3d 1378, 1382-83 (Fed. Cir. 2021) (clarifying that *Cucuras* does not stand for proposition that medical records are presumptively accurate and complete). While not presumed to be complete and accurate, medical records made while seeking treatment are generally afforded more weight than statements made by petitioner after-the-fact. *See Gerami v. Sec'y of Health & Human Servs.*, No. 12-442V, 2013 WL 5998109, at *4 (Fed. Cl. Spec. Mstr. Oct. 11, 2013) (finding that contemporaneously documented medical evidence was more persuasive than the letter prepared for litigation purposes), *mot. for rev. denied*, 127 Fed. Cl. 299 (2014). Indeed, "where later testimony conflicts with earlier contemporaneous documents, courts generally give the contemporaneous documentation more weight." *Campbell ex rel. Campbell v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 779 (2006); *see United States v. U.S. Gypsum Co.*, 333 U.S. 364, 396 (1948).

Despite the weight afforded to medical records, special masters are not bound rigidly by those records in determining facts such as the onset of a petitioner's symptoms. *Vallenzuela v. Sec'y of Health & Human Servs.*, No. 90-1002V, 1991 WL 182241, at *3 (Fed. Cl. Spec. Mstr. Aug. 30, 1991); *see also Eng v. Sec'y of Health & Human Servs.*, No. 90-175V, 1994 WL 67704, at *3 (Fed. Cl. Spec. Mstr. Feb 18, 1994) (explaining that § 13(b)(2) "must be construed so as to give effect to § 13(b)(1) which directs the special master or court to consider the medical record...but does not require the special master or court to be bound by them"); *see also Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

In short, "the record as a whole" must be considered. § 13(a).

## C. Evaluating Expert Testimony

21

Establishing a sound and reliable medical theory connecting the vaccine to the injury often requires a petitioner to present expert testimony in support of his or her claim. *Lampe v. Sec'y of Health & Human Servs.*, 219 F.3d 1357, 1361 (Fed. Cir. 2000). The Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), requires that courts determine the reliability of an expert opinion before it may be considered as evidence. "In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." *Id.* at 590 (citation omitted). Thus, for Vaccine Act claims, a "special master is entitled to require some indicia of reliability to support the assertion of the expert witness." *Moberly ex rel. Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1324 (Fed. Cir. 2010). The *Daubert* factors are used in the *weighing* of the reliability of scientific evidence proffered. *Davis v. Sec'y of Health & Human Servs.*, 94 Fed. Cl. 53, 66-67 (2010) ("uniquely in this Circuit, the *Daubert* factors have been employed also as an acceptable evidentiary-gauging tool with respect to persuasiveness of expert testimony already admitted"). Where both sides offer expert testimony, a special master's decision may be "based on the credibility of the experts and the relative persuasiveness of their competing theories." *Broekelschen*, 618 F.3d at 1347 (citing *Lampe*, 219 F.3d at 1362). And nothing requires the acceptance of an expert's conclusion "connected to existing data only by the *ipse dixit* of the expert," especially if "there is simply too great an analytical gap between the data and the opinion proffered." *Snyder ex rel. Snyder v. Sec'y of Health & Human Servs.*, 88 Fed. Cl. 706, 743 (2009) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

### D.  Consideration of Medical Literature

Finally, although this decision discusses some but not all of the literature in detail, the undersigned reviewed and considered all of the medical records and literature submitted in this matter. *See Moriarty ex rel. Moriarty v. Sec'y of Health & Human Servs.*, 844 F.3d 1322, 1328 (Fed. Cir. 2016) ("We generally presume that a special master considered the relevant record evidence even though [s]he does not explicitly reference such evidence in h[er] decision."); *Simanski v. Sec'y of Health & Human Servs.*, 115 Fed. Cl. 407, 436 (2014) ("[A] Special Master is 'not required to discuss every piece of evidence or testimony in her decision.'" (citation omitted)), *aff'd*, 601 F. App'x 982 (Fed. Cir. 2015).

### VII.    Discussion

Petitioner did not allege an injury listed on the Vaccine Injury Table, therefore her claim is classified as "off-Table." As noted above, for petitioner to prevail on an "off-Table" claim, she must submit a sound and reliable theory that C.L.H.'s injury resulted from the MMRV vaccine. *Capizzano*, 440 F.3d at 1320. Doing so shifts the burden to respondent to show that the injury was caused by factors unrelated to the vaccination. *Deribeaux ex rel. Deribeaux v. Sec'y of Health & Human Servs.*, 717 F.3d 1363, 1367 (Fed. Cir. 2013).

### A.  Sound and Reliable Theory

*Althen* Prong 1 / *Loving* Prong 4 requires that petitioner provide a "reputable medical theory" demonstrating that the vaccine received *can* cause the type of injury alleged. *Pafford*, 451

F.3d at 1355-56 (citation omitted). To satisfy this prong, petitioner's "theory of causation must be supported by a 'reputable medical or scientific explanation.'" *Andreu ex rel. Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009) (quoting *Althen*, 418 F.3d at 1278). The theory need only be "legally probable, not medically or scientifically certain." *Id.* at 1380 (emphasis omitted) (quoting *Knudsen*, 35 F.3d at 548). Nevertheless, "petitioners [must] proffer trustworthy testimony from experts who can find support for their theories in medical literature." *LaLonde v. Sec'y of Health & Human Servs.*, 746 F.3d 1334, 1341 (Fed. Cir. 2014).

### i. The Experts

Dr. Weber opined that the MMRV vaccine triggered a diffuse inflammatory response sufficient to cause vasculitis which resulted in thrombosis or blood clots in the heart, leading to cardiac arrest and a heart transplant. Pet. Ex. 41; Pet. Ex. 50; Pet. Ex. 51. More specifically, he opined MMRV is a live vaccine which, like a live virus, can cause diffuse inflammation throughout the body, leading to the development of arterial thrombi resulting in obstruction to coronary artery blood flow. Pet. Ex. 50 at 3; Tr. 34. The side effect of vaccines is similar to that of a viral insult with symptoms including vomiting, diarrhea, malaise, fever, and anything typical of an immunological response. Tr. 34.

Vasculitis is inflammation of the blood vessels that can cause the walls of the blood vessels to thicken and narrow, cutting off the blood supply to tissues and organs. Pet. Ex. 41 at 3. Dr. Weber opined that vasculitis is a known but rare side effect of the MMRV vaccine because the package insert includes vasculitis under adverse events reported during clinical trials and post-marketing surveillance, therefore there must be data to support this warning. Pet. Ex. 41 at 2-3; Pet. Ex. 47; Tr. 34-35. Dr. Weber conceded that there is no peer-reviewed or epidemiologic research to support his theory, but he argued "it is safe to assume" there is data to support vasculitis after MMRV vaccine because it is contained in the package insert. Pet. Ex. 41 at 3-4; Pet. Ex. 47. Therefore, "it is possible that the administration of this MMRV vaccine can cause vasculitis, which if it affects the large and small arterial vessels such as the aorta or coronary arteries, can constrict blood flow to the heart muscle resulting in myocardial ischemia or infarction, and subsequent heart failure." Pet. Ex. 41 at 3-4; Pet. Ex. 46; Pet. Ex. 47.

Dr. Weber relied on *Belizna* to support that vasculitis may be associated with infection or immunization. Tr. 36; Pet. Ex. 51 at 1, 5. He stated that *Belizna* discussed vaccines, in particular hepatitis B vaccine, being associated with vasculitis. Tr. 36-37. When noted that *Belizna* discussed hepatitis B infection not vaccination, he stated that the article discussed vasculitis in response to the infectious agent, "[s]o I extrapolate that . . . the live virus itself, even attenuated, is the antigenic portion that the body would respond to." Tr. 37. When it was noted that the data only referred to hepatitis B virus and that measles data was weak and anecdotal, he responded that these studies are adult-oriented and the amount of HLHS patients receiving MMRV vaccine is so low that finding a rate of incidence would be "virtually impossible." Tr. 37-38.

23

*Belizna* discussed how cytokines including tumor necrosis factor[43] and various interleukins[44] are produced directly by stimulation from infectious agents with subsequent recruitment of neutrophils to the small vessels that can lead to the development of vasculitis. Pet. Ex. 51 at 2. *Belizna* concluded that this mechanism of vascular injury has only been associated with streptococcus and staphylococcus infection. In contrast, the authors noted a weak association with measles virus; the study did not discuss the vaccine. *Id*. at 2-3. Further, the authors noted that "[t]he link between infection and vasculitis is an intriguing subject that has not yet been explored thoroughly" with most data coming from "sporadic case reports." Firm conclusions linking infectious agents to the pathogenesis of vasculitis cannot be drawn based on such evidence. *Id*. at 3, 5.

Dr. Weber also relied on *Sharma*, which described systemic vasculitis as inflammation of the blood vessel walls that can affect any organ, resulting in a wide range of signs and symptoms. Pet. Ex. 52 at 1. *Sharma* also noted that the pathogenesis of systemic vasculitis is poorly understood. *Id*. at 2. Three possible mechanisms were proposed, including immune complex deposition, ANCAs (antineutrophil cytoplasmic antibodies which is a humoral response), and T-lymphocyte response with granuloma formation (or cell-mediated) with the end result being hemorrhage in surrounding tissues and weakening of the vessel walls leading to the formation of aneurysms. *Sharma* cautioned that the triggering event initiating and driving this inflammatory response is mostly unknown. *Id*. Further, patients with systemic vasculitis are at an increased risk of comorbidities from organ damage and immunotherapies used for treatment, including steroids and cyclophosphamide, a medication that predisposes patients to infection and can cause hemorrhagic cystitis, ovarian and testicular failure, and bladder cancer. *Id*. at 9; *see also* Resp. Ex. F Tab 1.

Dr. Weber's theory of vasculitis is based primarily on the package insert for the MMR II vaccine[45] and temporal relationship between the vaccine administration and the cardiac events. The MMR II vaccine package insert includes "Vasculitis" under "Adverse reactions" reported during clinical trials or during post-marketing surveillance. Pet. Ex. 33 at 1; Pet. Ex. 41 at 3-4, 5; Pet. Ex. 47. C.L.H. did not receive the MMRII vaccine. Dr. Weber also provided the *General Best Practice Guidelines for Immunizations: Contraindications and Precautions*, which instructs that "[s]everely immunocompromised[46] persons generally should not receive live vaccines." Pet. Ex. 36 at 1, 6. He also relied on the MMRV Vaccine Information Statement, which instructs that no aspirin[47] should be taken for 6 weeks after getting a vaccine that contains varicella to avoid any

---

[43] Tumor necrosis factor is a lymphokine, which is a soluble cytokine that mediates immune responses; it is not an antibody or a complement component and is released by sensitized lymphocytes on contact with antigen. *Dorland's* at 670, 1071.

[44] Interleukin a generic term for a group of multifunctional cytokines that are produced by a variety of lymphoid and nonlymphoid cells and have effects at least partly within the lymphopoietic system. *Dorland's* at 937.

[45] *Supra* note 38. The ProQuad MMRV vaccine insert does not include vasculitis as an adverse event. *See* Court Ex. 1.

[46] Immunocompromised is a term for having the immune response attenuated by administration of immunosuppressive drugs, by irradiation, by malnutrition, or by some disease processes. *Dorland's* at 906. C.L.H. was not immunocompromised.

[47] *The General Best Practice Guideline for Immunizations; Contraindications and Precautions* specifically states that "[n]o adverse events associated with the use of aspirin or aspirin-containing products after varicella vaccination have been reported; however, the vaccine manufacturer recommends that vaccine recipients avoid using aspirin or aspirin-containing products for 6 weeks after receiving varicella vaccines because of the association between aspirin use and

risk of developing Reye's Syndrome; it does not include any reference to vasculitis, thrombosis, or cardiac events resulting from receipt of the vaccine. Pet. Ex. 2 at 21-22; Pet. Ex. 35 at 1-2.

Dr. Weber agreed that Reye's Syndrome "was probably not the causitive (sic) issue here" and that in his practice he would stop aspirin in advance of varicella vaccine then restart it to avoid any complications or the "theoretical risk of Reye's Syndrome." He agreed use of aspirin was a precaution for varicella vaccine, not a contraindication. Tr. 54, 57-58; Pet. Ex. 36 at 8. Although Reye's Syndrome was no longer being offered as a theory in this case following the hearing, it bears mentioning that Dr. Weber conflated the association between the use of aspirin following the receipt of varicella vaccine due to concerns of Reye's Syndrome with components of the MMRV vaccine causing Reye's Syndrome. Tr. 57-62. Petitioner was exempted from MMRV vaccine not because the vaccine itself posed a risk with his pre-existing heart condition but rather because he would have to be taken off aspirin for six weeks in order to receive the Varicella portion of the vaccine, and his cardiologist felt the risk of not taking aspirin exceeded the risk of not getting the Varicella vaccine. Tr. 14. Notably, he received his first MMR vaccine on May 7, 2010, and the subject vaccine was his second MMR but first Varicella vaccination. Pet. Ex. 56.

Dr. Weber confirmed that his theory involved a systemic inflammatory reaction to the MMRV vaccine such as vasculitis that in turn propagated and led to an aortic root and left coronary artery thrombosis resulting in myocardial injury, heart failure, and need for heart transplant. Tr. 54; Pet. Ex. 41 at 2. The package insert for the MMRII vaccine supported his theory because vasculitis was listed as a potential adverse reaction, but he agreed that he did not see any data or background details for its inclusion. Tr. 62, 64-65. Further, he could not find any literature that associated MMRV vaccine with vasculitis. However, it would be impossible to determine how many cases of arterial thromboses or similar events have occurred from the vaccine since thrombosis is very rare in this population. Tr. 63. He agreed that vasculitis was not considered by any of C.L.H.'s treating physicians as a diagnosis and the medical records do not include vasculitis but argued that the treating physicians investigated some sort of inflammatory response. Tr. 66. Dr. Weber confirmed that this is what he thinks may have happened but nothing in the medical records confirms vasculitis or a systemic reaction. Tr. 67-68. "[I]t's a difficult, if not impossible, diagnosis to make unless you have the advantage of histologic evidence of the vessel involved, or you look at laboratory markers…consistent with a systemic inflammatory response…that's the best you can do." Tr. 122.

Summarily, Dr. Weber concluded that what happened here could happen to anyone receiving an MMRV vaccine, but "[t]he strength of [his] opinions…lies in the logical sequence of cause and effect, along with the timing of presentation." Pet. Ex. 41 at 3. The MMRV vaccine is a combination of the live MMR II and live Varicella vaccinations, and the MMR II vaccine has a serious but rare side effect of vasculitis, which can cause blood clots that obstruct blood flow. *Id*. at 3; Pet. Ex. 46; Pet. Ex. 47; Pet. Ex. 51; Pet. Ex. 52. He conceded there is no peer reviewed or epidemiological evidence to support his theory but "assume[s]" there must have been incidences of vasculitis during the clinical trials because vasculitis is contained in the package insert for the

---

Reye syndrome after varicella. . . The risk for serious complications associated with aspirin is likely to be greater in children in whom natural varicella develops than it is in children who receive the vaccine containing attenuated VZV." Pet. Ex. 36 at 10. The warning is consistent with recommendations against the use of aspirin in children in 1980, after which the number of reported cases of Reye syndrome fell dramatically. Resp. Ex. C Tab 10.

MMR vaccine. Pet. Ex. 41 at 4. Since C.L.H. already had a compromised cardiac condition due to HLHS, vasculitis was a "plausible" theory related to the injury based on "general causation." Pet. Ex. 41 at 4.

Dr. Yeager disagreed that MMRV vaccine could initiate a systemic reaction or vasculitis sufficiently severe to result in secondary aortic root and coronary thrombosis. He submitted that there is no evidence that MMRV vaccine can increase the risk of hypercoagulability or thrombotic complication. There is also no evidence in the medical records here of vasculitis. Resp. Ex. E at 2; Resp. Ex. F at 2. He argued that petitioner failed to present a plausible mechanism that implicates MMRV vaccine with the clinical events. Resp. Ex. F at 3. Dr. Yeager added it appeared that the proposed theory was largely based on the package insert for the MMR vaccine but was unsupported by either scientific literature or the facts of the case. Resp. Ex. A at 4; Resp. Ex. E at 1; Resp. Ex. F at 2. Finally, "virtually all patients" who suffer vasculitis have elevated systemic inflammatory markers, particularly C-reactive protein which is a highly sensitive marker of systemic vasculitis. Here, the CRP levels were normal, making the diagnosis of vasculitis highly unlikely. Resp. Ex. F at 2; Resp. Ex. F Tab 1; Resp. Ex. G at 2; Pet. Ex. 8 at 237.

Dr. Yeager concluded that the proposed theory in this case—that the MMRV vaccine triggered inflammation, vasculitis, subsequent thrombosis, cardiac arrest, and the need for a heart transplant—lacked clinical or laboratory support, was "entirely speculative," and vasculitis was never diagnosed or even considered. Resp. Ex. F at 2, 3; Resp. Ex. G at 2. Further, there is no evidence to support that the MMRV vaccine increases the risk of hypercoagulability or thromboembolic complications. Resp. Ex. E at 2. HLHS, with its attendant surgical requirements and Fontan circulation, places these patients at lifelong and cumulative risk of thromboembolic events. There is no medically sound mechanism presented to implicate the MMRV vaccine in the series of events that occurred in this case. Resp. Ex. F at 1, 2.

### ii.    The Analysis

At the conclusion of the hearing, there was a discussion with counsel about petitioner's theory in light of Dr. Weber's concessions that there was no mention of systemic reaction or vasculitis following the MMRV vaccine in the medical records and no support in the medical literature that MMRV vaccine can cause blood clots or vasculitis. Also noted was Dr. Weber's reliance on the package insert which included vasculitis under adverse events and clinical trial reports. Tr. 124-25.

Counsel responded that Dr. Weber provided "plausible medical explanations for what could have occurred" and that Dr. Yeager agreed with the timing of the events. Therefore, petitioner had put "forth a plausible theory scientifically [that] gets us over that threshold." Tr. 125-26. "[T]he answer we continue to come back to is we have theories about reactions to live virus vaccines when they're introduced into the system, we have a temporal relationship between the administration of the vaccine and what happened to [C.L.H.]." The case law and committee notes from when the Vaccine Act was created contemplated "situations [where] individuals receive a vaccine, manifest an illness, and it might not truly be related to the vaccine, but they're still compensated because of that nature." Tr. 126-27. He was not suggesting that the Court go against case law or what is required but suggested that when considering the injury, the articles submitted

26

by both sides, petitioner's opening argument and the limitations imposed by the emergent nature of the events "from a medically sound standpoint [] vasculitis could indeed have been happening…that there is some information in the records to say that he was suffering from some form of vasculitis, and/or some type of systematic response" because the medical records reference systemic response, myocarditis, sepsis, and viral infection with no answer reached due to the sudden nature of what transpired. Tr. 127-28. Considering the arterial nature of the systemic inflammation, clotting in the root and going through the body, it "would seem to fit the box of some systemic vasculitis-type or vasculitis. That's the best we can do, and that's what we've tried to put forward and…stress in our argument here." Tr. 128.

It was noted to counsel that the list he referred to of illnesses and conditions contained in the medical record were differential diagnoses considered by the treating physicians prior to a diagnosis being made and does not mean that any of those illnesses or conditions occurred, and in fact all were ruled out with testing. Tr. 132-33.

The bottom line is that Dr. Weber conceded that his opinion relies heavily on the logical sequence of cause and effect and timing of presentation. Pet. Ex. 41 at 3. Dr. Weber argued that he offered a "plausible theor[y] related to the injury based on a 'general causation' approach." *Id*. at 4. There is no peer reviewed or epidemiological research to support his theory, but he "assume[s]" data exists showing vasculitis after MMR because it is contained in the package insert. *Id*.

Dr. Weber's theory, however, fails to provide, explain, or even allude to any component of or structure in the MMRV vaccine that can cause blood clots. Instead, his opinion contains generalities and possibilities based on temporal relationship and the mere mention of vasculitis in a vaccine package insert for the MMR II vaccine. Special masters have not given manufacturers' package inserts much weight.[48] Moreover, the package insert Dr. Weber relied upon was for the MMR II vaccine, not the vaccine that C.L.H. received *See* Resp. Ex. C Tab 8 Tables 1 & 2

---

[48] In a leading case, one special master went so far as to declare that "federal regulations specifically preclude the contents of drug product labels, as reproduced in the [Physician's Desk Reference], from serving as admissions regarding causation." *Werderitsch v. Sec'y of Health & Human Servs*., No. 99-319V, 2005 WL 3320041, at *8 (Fed. Cl. Spec. Mstr. Nov. 10, 2005). Relying upon regulations found at 21 C.F.R. § 600.80, *Werderitsch* reasoned that because the Food and Drug Administration requires manufacturers to list adverse occurrences regardless of causality, the listing of an event on a product insert does not support a finding of causation. Other cases declining to rely upon package inserts to support a finding of causation include but are not limited to: *Salerno v. Sec'y of Health & Human Servs*., No. 16-1280, 2020 WL 344163, at *13 (Fed. Cl. Spec. Mstr. May 29, 2020); *Bender v. Sec'y of Health & Human Servs*., No. 11-693V, 2018 WL 3679637, at *31 (Fed. Cl. Spec. Mstr. July 2, 2018) (noting that "vaccine package inserts do not constitute causation evidence meriting significant weight"), *mot. for rev. denied*, 141 Fed. Cl. 262 (2019); *Tompkins v. Sec'y of Health & Human Servs*., No. 10-261V, 2013 WL 3498652, at *14 (Fed. Cl. Spec. Mstr. June 21, 2013) (citing the testimony of petitioner's expert who acknowledged that reports in package inserts "may reflect a temporal relationship between vaccine and illness"), *mot. for rev. denied*, 117 Fed. Cl. 713 (2014); *Coppola v. Sec'y of Health & Human Servs*., No. 09-631V, 2012 WL 1118849, at *26 (Fed. Cl. Spec. Mstr. Mar. 7, 2012) (rejecting a petitioner's reliance on vaccine package insert information as indicative of alleged vaccine causation); *Doe v. Sec'y of Health & Human Servs*., No. 99-670V, 2004 WL 3321302, at *14 (Fed. Cl. Spec. Mstr. Oct. 5, 2004) (finding that petitioner failed to establish that hepatitis B vaccine can cause chronic fatigue syndrome although the package insert listed several symptoms petitioner experienced). *But see Russell v. Sec'y of Health & Human Servs*., No. 11-0282V, 2014 WL 4922194, at *7 (Fed. Cl. Spec. Mstr. Sept. 9, 2014) (giving some weight to a manufacturer's report of an adverse event "judged to be vaccine related by the study investigator" but still finding that petitioner failed to meet the burden regarding prong 1).

(distinguishing the composition of different manufacturers' MMR and MMRV combination vaccines). C.L.H. received the ProQuad vaccine, which does not include vasculitis as an adverse event in the package insert. *See* Pet. Ex. 17 at 31; Court Ex. 1; Pet. Ex. 47. Moreover, neither the MMR II nor ProQuad vaccine package inserts identify a risk of thrombosis or thromboembolism. Pet. Ex. 47; Court Ex. 1.

Indeed, petitioner does not need to rely on medical literature specifically to support her theory, nor does a theory need to be scientifically certain; but she must provide preponderant evidence of a sound and reliable theory as to how the specific vaccine can cause the specific injury alleged. In this case, petitioner has failed to provide any sound and reliable mechanism by which MMRV vaccine can cause thrombosis. Dr. Weber's "plausible" theory is insufficient to sustain this essential component of petitioner's burden. *See, e.g.*, *Canuto v. Sec'y of Health & Human Servs.*, 660 Fed. Appx. 955, 957 (Fed. Cir. 2016) (citing *W.C. v. Sec'y of Health & Human Servs.*, 704 F.3d at 1356 (Fed. Cir. 2013) ("[T]he petitioner must do more than demonstrate a 'plausible' or 'possible' causal link between the vaccination and the injury[.]"); *Cerrone v. Sec'y of Health & Human Servs.*, 146 F.4th 1113, 1120-21 (Fed. Cir. 2025) (rejecting the petitioner's argument on appeal that *Althen* Prong 1 requires proof of only a "biologically plausible" theory and stating that the petitioner's "argument understates the burden he bears" under *Althen*).

Accordingly, petitioner has failed to provide a sound and reliable medical theory connecting the MMRV vaccination to the injury alleged herein and has therefore failed to satisfy *Althen* Prong 1 / *Loving* Prong 4.

## C. Logical Sequence of Cause and Effect

*Althen* Prong 2 / *Loving* Prong 5 requires proof of a "logical sequence of cause and effect." *Capizzano*, 440 F.3d at 1326 (quoting *Althen*, 418 F.3d at 1278). In other words, even if the vaccinations can cause the injury, petitioner must show "that it did so in [this] particular case." *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 962 n.4 (Fed. Cir. 1993) (citation omitted). "A reputable medical or scientific explanation must support this logical sequence of cause and effect," *id.* at 961 (citation omitted), and "treating physicians are likely to be in the best position to determine whether a logical sequence of cause and effect show[s] that the vaccination was the reason for the injury," *Paluck v. Sec'y of Health & Human Servs.*, 786 F.3d 1373, 1385 (Fed. Cir. 2015) (quoting *Andreu*, 569 F.3d at 1375). Petitioner is not, however, required "to eliminate alternative causes as part of establishing [their] prima facie case." *Doe v. Sec'y of Health & Human Servs.*, 601 F.3d 1349, 1357-58 (Fed. Cir. 2010); *see Walther v. Sec'y of Health & Human Servs.*, 485 F.3d 1146, 1152 (Fed. Cir. 2007) (holding that a "petitioner does not bear the burden of eliminating alternative independent potential causes").

It is undisputed that C.L.H. was born with HLHS and was 7 years post-Fontan surgery at the time of vaccination.

Dr. Weber opined that C.L.H. would not have required a heart transplant, at least until adulthood, but for the MMRV vaccine. He provided four reasons why the MMRV vaccine was a substantial factor in C.L.H.'s development of blood clots and subsequent heart failure requiring heart transplant. First, C.L.H. was stable prior to receipt of the MMRV vaccine. Second, he was

treated with IVIG, which suggested a systemic inflammatory process like vasculitis.[49] Pet. Ex. 39 at 3; Pet. Ex. 41 at 4, 6. Third, thrombotic events causing myocardial infarction and heart failure in Fontan patients generally occur in the venous Fontan circuit, not in the systemic arterial circuit as seen here. Pet. Ex. 39 at 2, 3; Pet. Ex. 41 at 2, 4, 7. Fourth, the temporal relationship between receipt of the MMRV vaccine and the onset of cardiac injury provides a logical sequence of cause and effect. Pet. Ex. 39 at 2, 3; Pet. Ex. 41 at 5.

Each of Dr. Weber's reasons for implicating the MMRV in this case will be addressed in turn with the fourth reason regarding temporal relationship discussed under the section for *Althen* Prong 3 / *Loving* Prong 6.

### i.    C.L.H. Was Stable Prior to Vaccination

Dr. Weber argued that C.L.H. was well during the cardiology visit four months prior to receiving the MMRV vaccine, and thus not at increased risk of thrombosis. Pet. Ex. 12 at 725. Dr. Yeager did not dispute that C.L.H. was well at this visit, but rather argued that was immaterial because HLHS patients have a high risk of developing thrombosis, which can develop at any age and rapidly without any preceding symptoms.

More specifically, Dr. Weber opined that C.L.H. was clinically healthy for a patient with HLHS when he received the MMRV vaccination on August 24, 2018 with no increased risk for cardiac complications or thrombotic event. Pet. Ex. 39 at 2; Pet. Ex. 41 at 4, 6; Pet. Ex. 50 at 1; Tr. 32. He acknowledged that Fontan patients have slightly lower than normal systemic saturation depending on how big the fenestration is and that HLHS patients are at a "small risk" of venous thrombotic events but usually in adulthood. Pet. Ex. 39 at 3; Tr. 33. But assuming C.L.H. took his daily aspirin, his risk of thrombosis was "extremely low." Tr. 32.

Dr. Weber stated that he had never seen an HLHS patient require a heart transplant following a thrombotic event like C.L.H. and never heard of this happening after MMRV vaccine, but what occurred was rare since these patients generally do not receive MMRV vaccines. Tr. 29-30, 47.

Dr. Weber agreed that thromboembolic events can be acute or delayed. Tr. 68. He stated that C.L.H. "deteriorated in a fairly acute fashion" by September 2, 2018. Tr. 39-40. Dr. Weber then stated that the clotting was progressive not sudden based on the sequence of symptoms of lower cardiac output with some cardiac ischemia before September 2, 2018. Compromised coronary blood flow can be relatively asymptomatic, but symptoms can progress as ischemia gets worse. Tr. 40-41.

---

[49] At hearing, in addition to the IVIG treatment, Dr. Weber raised the use of antibiotics as further evidence of a systemic inflammatory response or vasculitis. The possibility was raised that antibiotics were used prophylactically or to prepare C.L.H. for heart transplant rather than to treat any active inflammatory process. This was discussed further with counsel at the conclusion of the hearing, and additional expert reports addressing the issue were ordered. Tr. 129-31. In their post-hearing reports, both Dr. Weber and Dr. Yeager agreed that broad-spectrum antibiotics are used following cardiac arrest, while on ECMO, and while awaiting transplant. Thus, use of broad-spectrum antibiotics does not necessarily indicate the presence of an inflammatory process. Pet. Ex. 57 at 1; Resp. Ex. J at 1-2.

Dr. Weber disagreed that the events herein were the unfortunate outcome of a sick child with a congenital heart defect because he was doing well before the MMRV vaccine and given the temporal relationship to the vaccine and clinical response, "I think [it] adds up." Tr. 47.

Dr. Yeager noted that HLHS surgeries are palliative not corrective procedures that leave patients with the "effects of that abnormal circulation . . . [in] every organ of the body." Tr. 76-77. Therefore, Fontan patients are at high risk of thromboembolic complication with the incidence depending on how frequently they are evaluated. Resp. Ex. A at 4-5; Tr. 104. Thus, blood clots in Fontan patients are "uncommon" but are not "rare." Tr. 79.

Dr. Yeager referred to *Alsaied*, a recent meta-analysis of 1200 HLHS patients, which found the incidence of thromboembolic complications including myocardial infarction and heart failure to be 11.8%. Resp. Ex. A at 4; Resp. Ex. A Tab 5. He also referred to *Watkins*, which showed 9 out of about 500 HLHS patients had thrombosis. Tr. 79; Resp. Ex. G Tab 1. *Rajab* found thrombosis in 2% of their patients. Tr. 79; Resp. Ex. G Tab 2. Based on the literature, Dr. Yeager submitted that thrombosis in HLHS patients is not "rare," but rather "is an uncommon but well-established, well-recognized complication of patients with hypoplastic left heart." Tr. 79-80; Resp. Ex. F at 1. Further, literature supports the occurrence from infancy through adulthood. Tr. 80. Almost all of these patients are on low-dose aspirin. Tr. 81.

Dr. Yeager also pointed out that C.L.H. was found to have a hereditary mutation associated with increased risk of thrombosis, specifically a 4G/5G mutation that results in increased plasminogen activator inhibitor type 1 activity. Resp. Ex. F at 3; Pet. Ex. 8 at 18-21. The 4G/5G or 4G/4G genotypes may result in decreased fibrinolysis and increased risk of thrombosis, which is especially significant for those with other thrombophilia risk factors. Resp. Ex. F at 3.

Dr. Yeager opined that C.L.H. was at risk for the development of thrombosis, cardiac arrest, or heart failure supported by the literature which includes a "lifelong and cumulative risk for thromboembolic complications" in HLHS patients. Resp. Ex. F at 2. The fact that C.L.H. was stable and doing well on April 30, 2018 does not change or negate his risk for thrombotic events. *Id.*; Pet. Ex. 45 at 2; Tr. 81-83, 94. Further, "[t]hrombotic coronary occlusion is, by its nature, a sudden and acute event, and does not require premonitory symptoms or findings" with many patients being asymptomatic, often with good ventricular and valve function, prior to their thromboembolic event. Resp. Ex. E at 1; Resp. Ex. A Tab 2 at 8-9. Still further, there are no particular risk factors predictive of this kind of event. Tr. 81-82. *Watkins* looked for evidence of factors that would flag high-risk patients but could not identify any. Some presented with chest pain arrhythmias, some had mild or severely depressed ventricular function, some had normal ventricular function, but many were asymptomatic; still, all subsequently developed thrombotic occlusion of the aortic roots and coronary. Tr. 82; Resp. Ex. G Tab 1.

The literature filed in this case establishes that HLHS patients have a lifelong risk of thrombosis, which can occur acutely at any age without warning or any preceding symptoms. The fact that C.L.H. was doing well for an HLHS patient four months prior to his receipt of the MMRV vaccination does not implicate the MMRV vaccine as the cause of his cardiac event. Instead, C.L.H. was at a significantly increased risk of thrombosis due to his heart condition and palliative

30

surgeries when compared to the general population. In addition to the increased risk due to his HLHS status post-Fontan, C.L.H. had a 4G/5G genetic mutation as well as polycythemia, both of which further predisposed him to thrombosis. Pet. Ex. 8 at 18-21; Pet. Ex. 12 at 724.

### ii. IVIG as Indicative of a Systemic Inflammatory Reaction Like Vasculitis

Dr. Weber's opinion focused on C.L.H. having some sort of inflammatory process like vasculitis triggered by the vaccine, which in turn caused the thrombosis and subsequent heart failure. As evidence of inflammation, Dr. Weber pointed to the IVIG order.

Dr. Weber argued that the administration of IVIG indicated that the treating physicians believed C.L.H. to be suffering from a severe inflammatory reaction such as vasculitis. Tr. 41-44, 66; Pet. Ex. 41 at 4-5; Pet. Ex. 9C at 2235. Systemic inflammatory response or SIRS was also included in the differential, but Dr. Weber conceded that a differential includes everything. Tr. 43. Dr. Weber pointed to C.L.H.'s blood work performed on September 3, 2018 revealing elevated C-reactive protein and procalcitonin[50] as indicative of a systemic reaction. Therefore, it is a "reasonable hypothesis" that C.L.H. suffered from vasculitis based on the order for IVIG and the temporal relationship with the MMRV vaccination. Tr. 42-43, 66, 68.

Later, Dr. Weber agreed that while concern for myocarditis could have prompted the IVIG order, the IVIG was discontinued after a half dose once myocarditis was ruled out. Tr. 66-67. Dr. Weber ultimately acknowledged that the root cause of C.L.H.'s thrombosis was never diagnosed, and the explanted heart five months later did not show any inflammatory response. Tr. 44.

Dr. Yeager agreed that IVIG is used to treat vasculitis, but in this case, it was ordered because the physicians believed C.L.H. may have had myocarditis due to his elevated troponin, significantly decreased ventricular function and for which IVIG is standard treatment. Resp. Ex. F at 2; Tr. 89-90; Pet. Ex. 10 at 559; Pet. Ex. 13 at 126. When C.L.H.'s troponin level continued to rise and EKG showed ischemic changes compared to prior EKG, he was taken to the catheterization lab where coronary thrombosis was identified, myocarditis was ruled out, and IVIG was discontinued. Pet. Ex. 8 at 248-49; Pet. Ex. 9C at 2235; Pet. Ex. 10 at 579; Pet. Ex. 15 at 351; Resp. Ex. J at 1. There was no mention of vasculitis. Resp. Ex. F at 2; Tr. 88. Dr. Yeager described CRP as a highly sensitive inflammatory marker of systemic vasculitis. He would expect a marked elevation of CRP for vasculitis sufficiently severe to cause thrombosis; but here, the CRP was "essentially normal," making vasculitis "extremely unlikely." Tr. 86-87; Resp. Ex. F at 2; Resp. Ex. F Tab 1; Pet. Ex. 8 at 237 (CRP level was 0.81 with reference range of 00.6-0.79). At hearing, however, Dr. Yeager acknowledged that C.L.H.'s CRP was outside of the reference range, but it was unclear whether the blood draw was performed before or after the half dose of IVIG. Tr. 96-97. Dr. Yeager also referred to the bottom of the laboratory report which included, procalcitonin and "[b]acterial etiology very likely, suggestive of presence. Antibiotics strongly recommended." He confirmed that MMRV is a viral vaccine not bacterial. Tr. 87-88; Pet. Ex. 8 at 237.

Dr. Yeager added that none of the medications prescribed were intended for severe inflammatory response or vasculitis, and rheumatology consultation was not sought, indicating

---

[50] Procalcitonin is an acute-phase protein that is the prohormone of calcitonin. Its serum level is elevated in bacterial infections, but rarely in viral infections, and rises as the severity of the infection increases. *Dorland's* at 1493.

that the treaters did not think an inflammatory process was likely. Tr. 107; Resp. Ex. J at 2-3; Resp. Ex. J Tab 1 at 1, 9, 15-16 (management of vasculitis in children requires prompt diagnosis and timely treatment of the severity of the inflammation and the particular organ affected as it can be life threatening if not appropriately managed). When an infectious disease consult was obtained on September 9, 2018, it was noted that the workup was negative for infection. Resp. Ex. J at 2.

The experts agreed that CRP levels in vasculitis or severe inflammatory reaction would be elevated and that IVIG would be the appropriate treatment. Here, the CRP level was mildly elevated at 0.81 on a range of 00.6-0.79. Pet. Ex. 8 at 237. For comparison, *Hind* found that the median CRP concentration for vasculitis patients in active disease was 107 mg $1^{-1}$. Resp. Ex. F Tab 1 at 1, 3, 5. Thus, C.L.H.'s CRP was not nearly as elevated as what is seen in patients with active vasculitis. Further, it is unclear when the bloodwork was done in relation to the IVIG dose C.L.H. received. It is clear, though, that IVIG was stopped after the blood clots were discovered and myocarditis was ruled out, making any severe inflammatory process such as vasculitis unlikely. Resp. Ex. F at 2; Pet. Ex. 8 at 237; Tr. 85-87. Furthermore, none of C.L.H.'s doctors documented concerns of profound systemic inflammation, and C.L.H. was never diagnosed with vasculitis. The evidence in this case does not support C.L.H. having suffered an inflammatory process or vasculitis.

### iii.    The Location of the Blood Clots Not Likely Related to His Heart Condition

Dr. Weber argued that the thrombosis found in the native ascending aorta and coronary arteries was "completely different from the anatomic location of thrombotic injuries" generally seen in Fontan patients. Pet. Ex. 39 at 2, 3; Pet. Ex. 41 at 3, 5, 6; Tr. 122. Dr. Weber distinguished the two sides of circulation, the venous side and the arterial side, asserting that while thrombotic events are unusual for both sides, the venous side is more common for thrombosis with Fontan. The arterial side would be "extremely rare." Tr. 50-51; Pet. Ex. 41 at 3; Pet. Ex. 44. C.L.H. was on an aspirin regimen to prevent blood clotting within the Fontan circuit (venous pathway). Pet. Ex. 41 at 4. Assuming he took his aspirin regularly, Dr. Weber submitted that his risk of thrombosis would be "extremely low, especially on the arterial side." Tr. 32. Maintaining that C.L.H. suffered vasculitis from the MMRV vaccine, he argued that vasculitis can develop rapidly or over time, asserting that given C.L.H.'s "already abnormal arterial vasculature at the ultimate site of injury (neoaortic arch and hypoplastic native ascending aorta) . . . [i]t is reasonable that he could develop vascular inflammation leading to arterial thrombosis and coronary occlusion which resulted in his ultimate injury within two weeks of receiving MMRV vaccine." Pet. Ex. 50 at 2; Pet. Ex. 53. He added that he had never seen a Fontan patient suddenly develop a massive arterial thrombosis in the native aorta leading to this type of outcome. Tr. 47-48.

Dr. Weber agreed that dehydration could cause thrombosis in a Fontan patient, but dehydration would have to be severe and is still less likely on the arterial side than the venous side. Further, C.L.H.'s blood work did not indicate dehydration. Tr. 48.

Dr. Yeager expressed confusion about Dr. Weber's assertion regarding the anatomic location of thrombotic injuries in Fontan patients when the literature supports thrombosis in both venous and arterial circuits and may also involve the coronary arteries. Resp. Ex. E at 1. Dr. Yeager provided literature discussing Fontan patients with both coronary and aortic root thrombosis, three of whom had palliated hypoplastic left heart syndrome, including a 10-year-old who developed

sudden onset, acute chest pain and was found to have extensive coronary thrombus. Resp. Ex. E at 1-2; Resp. Ex. E Tab 1; Resp. Ex. E Tab 2; Resp. Ex. E Tab 3; Resp. Ex. E Tab 4.

The literature filed in this case shows both systemic venous and arterial thromboembolic complications in Fontan patients with a high risk of thrombosis and thromboembolic events and a mortality rate of up to 38%, even with aggressive intervention. Resp. Ex. E at 1-2; Resp. Ex. C Tab 3; Resp. Ex. H at 6-7 (noting that "most (if not all) of the children who experienced native aortic thrombosis were under acetylsalicylic acid"). *Firdouse* noted the incidence of thromboembolism in Fontan circulation ranges from 3% to 20%, with both systemic venous and arterial thromboembolic complications associated with mortality rates of 25% in children and 38% in adults. Increased prevalence has been observed in longer follow-up. Pet. Ex. 44 at 3. The palliative surgeries for HLHS patients result in abnormal blood flow, which is believed to predispose these patients to NART. Resp. Ex. G Tab 2 at 1, 6. Myocardial ischemia is also seen in these patients if the antegrade flow is just enough for ejection but too small for adequate perfusion, and hypercoagulability in single ventricle patients may also be a contributing factor. *Id*. at 6.

HLHS is an uncommon congenital heart disease as are blood clots in HLHS patients. Pet. Ex. 45 at 3; Pet. Ex. 44. Nevertheless, the literature filed herein and discussed above supports that HLHS patients are at a high risk of blood clots, which can occur in the venous or arterial circulation or may develop elsewhere and travel. The fact that C.L.H.'s clot was ultimately found in the arterial side of his heart does not implicate the MMRV vaccine as the cause.

Based on the foregoing, petitioner failed to provide a logical sequence of cause and effect between the MMRV vaccine and C.L.H.'s development of thrombosis, heart failure, and need for heart transplant.

### D. Proximate Temporal Relationship

To satisfy the *Althen* Prong 3 / *Loving* Prong 6, petitioner must establish a "proximate temporal relationship" between the vaccination and the alleged injury. *Althen*, 418 F.3d at 1281. This "requires preponderant proof that the onset of symptoms occurred within a timeframe for which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation-in-fact." *De Bazan v. Sec'y of Health & Human Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). However, temporal relationship alone is not sufficient to prove causation. *Grant v. Sec'y of Health & Human Servs.*, 956 F.2d. 1144, 1148 (("When a petitioner relies upon proof of causation in fact rather than proof of a Table Injury, a proximate temporal association alone does not suffice to show a causal link between the vaccination and the injury").

Dr. Weber relied heavily on the temporal relationship between C.L.H.'s receipt of the MMRV vaccine and subsequent cardiac complications to support his theory, stating that he could not exclude the MMRV vaccine from the differential based on the temporal relationship. Pet. Ex. 2 at 2; Pet. Ex. 33 at 3; Pet. Ex. 39 at 1-2, 4; Pet. Ex. 41 at 3; Tr. 44-45, 66-67, 68.

Dr. Yeager acknowledged the temporal relationship but asserted that temporality between the MMRV vaccine and injury is not proof of causation. Resp. Ex. E at 2; Tr. 104. The kind of clotting and thrombus C.L.H. suffered could have happened to him at any age, and its discovery

may depend on how hard it was looked for because they are frequently asymptomatic. Tr. 102-03. When the cardiac catheterization was done on September 4, 2018, there was complete occlusion of the aortic root by the clot, but there is no way to pinpoint when it began or how quickly it developed. Tr. 103-04. As Dr. Weber stated, a clot can develop slowly without symptoms, then cause sudden occlusion which is when symptoms develop. Tr. 104.

Petitioner failed to provide a sound and reliable theory linking the vaccine and C.L.H.'s cardiac complications. It is therefore axiomatic that petitioner is unable to provide a medically appropriate timeframe for the MMRV vaccine to have caused the events in this case.

While Dr. Weber argued that Dr. Yeager "ignore[d]" the temporal relationship between the MMRV vaccine and the development of thrombosis, a more accurate summary of Dr. Yeager's opinion is that temporal relationship on its own is insufficient to show causation. This longstanding principle is recognized in the caselaw, which precludes a finding of causation based solely on temporality. *Grant*, 956 F.2d. at 1148.

The experts agreed that clots in these patients can develop abruptly or over time and be asymptomatic. Tr. 104, 128. Therefore, there is no way to determine when exactly the clots developed that resulted in C.L.H.'s cardiac arrest, leaving open the possibility that the clot was developing at the time he received the MMRV vaccination or at any time before or after the vaccination, culminating in an abrupt onset of symptoms on September 2, 2018. Therefore, petitioner has failed to provide preponderant evidence of a proximate temporal relationship between the vaccine and C.L.H.'s thrombosis, cardiac arrest, and heart failure.

### E.  The Remaining *Loving* Prongs

As to the remaining *Loving* Prongs, it is undisputed that C.L.H. was born with HLHS and underwent the necessary palliative surgeries pre-vaccination. It is also undisputed that he manifested symptoms of the blood clot, developed heart failure, and required a heart transplant after receipt of an MMRV vaccine. Temporal association notwithstanding, petitioner still must show that C.L.H.'s post-vaccination condition was significantly worsened by his vaccination, *i.e.* that the vaccination was a substantial factor in causing the injury. *Locane v. Sec'y of Health & Human Servs.*, 685 F.3d 1375, 1381-82 (Fed. Cir. 2012). As the foregoing shows, petitioner was unable to establish that the MMRV vaccination played any role in C.L.H.'s development of blood clots, cardiac arrest, and need for a heart transplant. Rather, the literature filed in this case shows that HLHS patients, even with treatment, are at risk of lifelong complications including thrombosis and reduced life expectancy. Pet. Ex. 45 at 2, 4; Resp. C Tab 1 at 8; Resp. Ex. C Tab 3. These patients' lives are affected both physically and mentally and for that I have great sympathy; but the events that transpired in this case are more likely the result of the unfortunate complications attendant to this serious congenital heart condition and not the result of C.L.H. having received the MMRV vaccination. Accordingly, petitioner has failed to establish the remaining *Althen* and *Loving* Prongs. *See* § 300aa-33(4); *Loving*, 86 Fed. Cl. at 144 (2009); *see also W.C.*, 704 F.3d at 1357.

### VIII.    Conclusion

I extend my sincere sympathies to C.L.H. and his mother for all that they have endured. However, my decision must be based on careful evaluation of all the evidence submitted in this matter and application of the law. In doing so, I find that petitioner has not provided preponderant evidence of causation under the Vaccine Act. The Clerk of Court shall enter judgment accordingly.[51]

**IT IS SO ORDERED**.

<u>**s/ Mindy Michaels Roth**</u>
Mindy Michaels Roth
Special Master

---

[51] Pursuant to Vaccine Rule 11(a), if a motion for review is not filed within 30 days after the filing of the special master's decision, the clerk will enter judgment immediately.

**Appendix: Medical Literature Cited**

| Exhibit | Citation |
| --- | --- |
| Pet. Ex. 35 | *MMRV Vaccine Information Statement*, U.S. Department of Health and Human Services Centers for Disease Control. |
| Pet. Ex. 36 | *General Best Practice Guidelines for Immunization: Contraindications and Precautions*, U.S. Department of Health and Human Services Centers for Disease Control. |
| Pet. Ex. 44<br><br>Resp. Ex. C Tab 3 | Mohammed Firdouse et al., *Thrombosis and Thromboembolic Complications in Fontan Patients: A Literature Review*, 20 Clinical & Applied Thrombosis/Hemostasis 484 (2014). |
| Pet. Ex. 45 | *Hypoplastic Left Heart Syndrome*, National Institute of Health, Genetic & Rare Diseases Information Center (2021). |
| Pet. Ex. 46 | *Vasculitis: Overview, Symptoms & Causes*, Mayo Clinic (2021). |
| Pet. Ex. 47 | MMR II FDA Package Insert. |
| Pet. Ex. 49 | Sophie Mavrogeni et al., *Systemic Vasculitis: An Underestimated Cause of Heart Failure-Assessment by Cardiovascular Magnetic Resonance*, 14 Rev. in Cardiovascular Medicine 49 (2013). |
| Pet. Ex. 51 | Cristina C. Belizna et al., *Infection and vasculitis*, 48 Rheumatology 475 (2009). |
| Pet. Ex. 52 | Poonam Sharma et al., *Systemic Vasculitis*, 83 Am. Family Physician 556 (2011). |
| Pet. Ex. 53 | *Vasculitis and the Nervous System Fact Sheet*, National Institute of Health, National Institute of Neurological Disorders and Stroke (2021). |
| Resp. Ex. A Tab 1 | Marjan Jahangiri et al., *Thromboembolism After the Fontan Procedure and Its Modifications*, 58 Annals of Thoracic Surgery 1409 (1994). |
| Resp. Ex. A Tab 2 | David N. Rosenthal et al., *Thromboembolic Complications After Fontan Operations*, 92 J. Am. Heart Ass'n 287 (1995). |
| Resp. Ex. A Tab 3 | Derek A. Fyfe et al., *Transesophageal Echocardiography Detects Thrombus Formation Not Identified by Transthoracic Echocardiography After the Fontan Operation*, 18 J. Am. College of Cardiology 1733 (1991). |
| Resp. Ex. A Tab 4 | Lance K. Shirai et al., *Arrhythmias and Thromboembolic Complications After the Extracardiac Fontan Operation*, 115 J. Thoracic Cardiovascular Surgery 499 (1998). |
| Resp. Ex. A Tab 5 | Tarek Alsaied et al., *Strategies for thromboprophylaxis in Fontan circulation: a meta-analysis*, 101 Heart 1731 (2015). |
| Resp. Ex. A Tab 6 | Shriprasad R. Deshpande et al., *Acute Embolic Myocardial Infarction and Heart Failure in a Fontan Patient: Recovery with Impella Device and Successful Transplantation*, Am. Soc'y for Artificial Internal Organs J. e52 (2016). |

| Resp. Ex. A Tab 7 | D.G. Wilson et al., *Systemic thromboembolism leading to myocardial infarction and stroke after fenestrated total cavopulmonary connection*, 73 Brit. Heart J. 483 (1995). |
|---|---|
| Resp. Ex. C Tab 1 | Rabia Javed et al., *Hypoplastic Left Heart Syndrome: An Overview for Primary Care Providers*, 40 Pediatrics in Rev. 344 (2019). |
| Resp. Ex. C Tab 4 | Eric Savitsky et al., *Emergency Department Presentations of Pediatric Congenital Heart Disease*, 24 J. Emergency Med. 239 (2003). |
| Resp. Ex. C Tab 8 | Frank Kowalzik et al., *MMR and MMRV vaccines*, 36 Vaccine 5402 (2018). |
| Resp. Ex. C Tab 10 | Jennifer Chapman & Justin K. Arnold, *Reye Syndrome*, National Institute of Health, National Center for Biotechnology Information Bookshelf (2020). |
| Resp. Ex. E Tab 1 | Ramin S. Hastings et al., *Embolic Myocardial Infarction in a Patient With a Fontan Circulation*, 5 World J. Pediatric & Congenital Heart Surgery 631 (2014). |
| Resp. Ex. E Tab 2 | Todd V. Brennan et al., *Late Thrombosis of the Native Aortic Root After Norwood Reconstruction for Hypoplastic Left Heart Syndrome*, 121 J. Thoracic & Cardiovascular Surgery 580 (2001). |
| Resp. Ex. E Tab 3 | Ahmed Subahi et al., *Percutaneous coronary intervention following Fontan procedure*, 28 IJC Heart & Vasculature 100511 (2020). |
| Resp. Ex. E Tab 4 | Abhishek R. Keraliya et al., *Thrombus in hypoplastic aorta: An uncommon cause of acute myocardial infarction*, 10 J. Cardiovascular Computed Tomography 263 (2016). |
| Resp. Ex. F Tab 1 | Charles R. K. Hind et al., *Correlation of disease activity in systemic vasculitis with serum C-reactive protein measurement. A prospective study of thirty-eight patients*, 15 Eur. J. Clinical Investigation 89 (1985). |
| Resp. Ex. G Tab 1 | Kimberly J. Watkins et al., *Native Aortic Root Thrombosis in Single-Ventricle Patients with Native-to-Neoaortic Anastomoses*, 43 Pediatric Cardiology 1247 (2022). |
| Resp. Ex. G Tab 2 | Taufiek Konrad Rajab et al., *Native Aortic Root Thrombosis After Norwood Palliation for Hypoplastic Left Heart Syndrome*, 112 Annals Thoracic Surgery 147 (2021). |
| Resp. Ex. G Tab 3 | Bhavi Patel et al., *Myocardial infarction due to thrombosis of native aorta late after Fontan procedure for hypoplastic left heart syndrome*, 14 Annals Pediatric Cardiology 72 (2021). |
| Resp. Ex. H | Massimiliano Cantinotti et al., *Native Aortic Root Thrombosis in Hypoplastic Left Heart Syndrome: An Unusual Presentation (Soon after Atrial Septal Stenting) of a Relatively Unusual Complication—Experience and Literature Review with an Outlook to Diagnosis and Management*, 12 J. Clinical Med. 5357 (2023). |
| Resp. Ex. J Tab 1 | David Cabral & Kimberly Morishita, *Vasculitis in children: Management overview*, UpToDate (2022). |
| Court Ex. 1 | MMRV ProQuad FDA Package Insert. |